92 P.3d 228 (2004)
151 Wash.2d 793
STATE of Washington, Respondent,
v.
James Ross THOMPSON, Petitioner.
No. 72997-2.
Supreme Court of Washington, En Banc.
Argued June 10, 2003.
Decided June 24, 2004.
*230 Rita Joan Griffith, Seattle, for Petitioner.
Kathleen Proctor, Pierce County Prosecuting Attorneys Office, Tacoma, for Respondent.
*229 BRIDGE, J.
James Ross Thompson seeks review of his conviction for unlawful manufacture of a controlled substance. Thompson asks this court to review three issues: (1) whether police could forcibly enter his home to execute a civil arrest warrant; (2) whether the "community caretaking function" allowed police to enter his home when there was no reason to believe someone was in danger or presented danger in the home; and (3) whether police were required to obtain his consent before searching the boathouse on the property. We conclude that when serving a civil arrest warrant, police may not forcibly enter into a home, and that in this case, a police officer's entry into Thompson's home to retrieve a guest's jacket was not justified by the community caretaking function. However, when applying the "common authority" standard, Thompson fails to qualify as a co-occupant and therefore his consent was not necessary to search the boathouse.

I
Thompson lived on his parents' property on Fox Island. He resided in a 22-foot travel trailer, owned by his parents, while his parents lived in a house on the property. Also on the property was a boathouse that had housed a boat owned by the elder Thompsons.
In June of 2000, Thompson's father, John, wanted Thompson removed from his property because John suspected that Thompson was involved in illicit drug activity. John contacted the Pierce County Sheriff's Office and reported that Thompson had an outstanding warrant for his arrest. Deputy Larson from the sheriff's office testified that he confirmed such warrant existed and it was for Thompson's failure to pay child support.
On June 5, 2000, Deputies Larson and Myron went to the trailer where Thompson was living to arrest him on the outstanding warrant. Upon arrival at the travel trailer, Deputy Larson announced, "[T]his is the sheriff[']s office, I have a warrant for James['] arrest." Clerk's Papers (CP) at 38; Report of Proceedings (RP) at 58. The deputies then heard movement and scuffling inside the trailer, and after waiting approximately 10 seconds, the deputies opened the door of the trailer. The deputies immediately saw Thompson and ordered him out of the trailer and to put his hands onto the trailer. Thompson was then handcuffed by Deputy Myron.
The deputies also observed that there was another individual inside the trailer and ordered him to come out also. Sund was patted down to make sure he was unarmed and told to leave the area. Before leaving, Sund told the deputies that he needed his jacket from inside the trailer. Deputy Larson entered the trailer to retrieve Sund's jacket and to make sure that no one else was inside. While inside the trailer, Deputy Larson observed that the oven was open and in it "was a container that had white crystalline residue *231 cooked onto it." RP at 41. He also testified that he smelled a strong chemical similar to paint thinner. Id. at 42. Based on his experience and training, Deputy Larson was concerned that the odor he detected was methamphetamine related so he quickly left the trailer.
After leaving the trailer, Deputy Larson placed Thompson in the back of the patrol car and Deputy Myron read Thompson his Miranda[1] rights. Based on the odor observed in the trailer, Deputy Larson went toward the elder Thompsons' home to look for Sund and to inform John Thompson of his son's arrest. Deputy Larson acknowledged that he wanted to arrest Sund because he was in the trailer where the deputy observed the suspicious items.
The elder Thompsons informed Deputy Larson that no one had come to the house. John Thompson then asked Deputy Larson to search the attached garage. Deputy Larson did not find anyone in the garage and asked John about the detached boathouse. The elder Thompson said that the boathouse was his, that James used it, and answered "`Please do,'" when Deputy Larson asked for permission to look inside. RP at 45.
Deputy Larson did not find Sund in the boathouse, but he did find items that were consistent with a methamphetamine lab in a living area on the second floor. After this observation, Deputy Larson asked the elder Thompsons to sign a consent form for a search of the boathouse, which they both did. Deputy Larson did not seek Thompson's consent either before or after the search.
At some point during his time on the property, Deputy Larson called for a team of methamphetamine lab investigators. Deputy Harms, a clandestine lab investigator, responded to the call. After conferring with Deputy Larson, Deputy Harms entered the trailer to make sure that the oven was turned off. Deputy Harms then inspected a burn barrel and a couple of burn piles outside the trailer that contained material consistent with the production of methamphetamine. He also checked the safety of a corroded propane tank that was located in front of the trailer. Finally, Deputy Harms looked inside the boathouse and observed the same items found by Deputy Larson earlier. After determining that the property appeared to be a methamphetamine lab but that it was a "fairly safe environment," Deputy Harms secured the premises. RP at 79-80. Deputy Harms returned the next day with a search warrant to process the evidence.
Thompson was charged with one count of unlawful manufacture of a controlled substance, methamphetamine. See former RCW 69.50.401(a)(1)(ii) (1998).[2] He sought to suppress the evidence obtained following his arrest. Pierce County Superior Court denied his motion to suppress evidence found in the trailer but concluded that Thompson's consent was necessary before the search of the boathouse. Despite finding the search of the boathouse invalid, the trial court convicted Thompson as charged following a bench trial on stipulated evidence.
In a published decision, Division Two of the Court of Appeals affirmed Thompson's conviction. State v. Thompson, 112 Wash.App. 787, 51 P.3d 143 (2002). Regarding the issue of forcible entry on a civil warrant, the Court of Appeals concluded that the knock and wait statute (RCW 10.31.040) could be applied to the service of such warrant because the deputies involved could not determine whether the warrant was for a criminal or civil matter, and thus, the officers had not acted unreasonably under the circumstances. Thompson, 112 Wash.App. at 795, 51 P.3d 143 ("[W]e decline to require officers at the scene of an arrest to anticipate the nature of any resulting court proceeding.").
With regard to the retrieval of Sund's jacket from the trailer, the Court of Appeals held that it was a valid exercise of the officer's community caretaking function. Thompson, 112 Wash.App. at 797, 51 P.3d 143. Finally, the Court of Appeals concluded that the officers did not need to obtain the consent of Thompson to search the boathouse *232 because the boathouse was a place "where one cohabitant might receive a visitor without the other cohabitant's consent." Id. at 802, 51 P.3d 143.

II

Knock and Wait Statute
Thompson argues that police officers should not be permitted, under the authority of RCW 10.31.040 (the "knock and wait" statute), to forcibly enter a private dwelling to serve a civil arrest warrant in a civil contempt procedure. We agree.
The "knock and wait" statute provides:
To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance.
RCW 10.31.040 (emphasis added).
The interpretation of a statute is a question of law, which is reviewed de novo by this court. State v. Tarabochia, 150 Wash.2d 59, 63, 74 P.3d 642 (2003). This court's primary duty in interpreting any statute is to discern and implement the intent of the legislature. State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003). If the statute's meaning is plain on its face, we are to give effect to that plain meaning as an expression of legislative intent. Tarabochia, 150 Wash.2d at 63, 74 P.3d 642. When the plain language is unambiguousthat is, when the statutory language has but one meaningthe legislative intent is clear, and the statute will not be interpreted otherwise. J.P., 149 Wash.2d at 450, 69 P.3d 318. Further, we cannot "`add words or clauses to an unambiguous statute when the legislature has chosen not to include that language.'" Id. (quoting State v. Delgado, 148 Wash.2d 723, 727, 63 P.3d 792 (2003)).
The plain language of RCW 10.31.040 is clear. Its unambiguous language does not encompass the enforcement of civil arrest warrants. Because we cannot add words or clauses to an unambiguous statute, we are prohibited from reading into the statute "civil actions." Thus, we presume that the legislature intended to exclude "civil actions" from RCW 10.31.040. Therefore, we hold that RCW 10.31.040 does not allow forcible entry into dwellings to execute civil warrants.
In the present case, there was a bench warrant for Thompson's arrest for failure to appear at a show cause hearing regarding his failure to pay child support. This warrant was issued under RCW 26.18.050, which provides that a civil bench warrant may be issued in such circumstances. RCW 26.18.050(3). In light of our holding today, the deputies erred in forcibly opening the trailer door when executing the civil warrant. The "knock and wait" statute does not encompass the execution of civil arrest warrants.

Community Caretaking Function
It has long been held that warrantless searches are per se unreasonable under the Fourth Amendment of the United States Constitution. State v. Kinzy, 141 Wash.2d 373, 384, 5 P.3d 668 (2000). However, there are exceptions to this warrant requirement. Id. The State bears the burden of showing a warrantless search falls within one of these exceptions. Id.
The community caretaking function, which is divorced from the criminal investigation, is one such exception to the warrant requirement. Id. at 385, 5 P.3d 668. This exception allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety. Id. at 386, 5 P.3d 668. Such invasion is allowed only if (1) the police officer subjectively believed that someone likely needed assistance for health or safety concerns; (2) a reasonable person in the same situation would similarly believe that there was need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place being searched. Id. at 386-87, 5 P.3d 668. "Whether an encounter made for noncriminal noninvestigatory purposes is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a `community *233 caretaking function.'" Kalmas v. Wagner, 133 Wash.2d 210, 216-17, 943 P.2d 1369 (1997).
The State argues that Deputy Larson was properly exercising the community caretaking function when he entered the trailer to retrieve Sund's jacket. The State contends that if Sund were to enter the trailer on his own to retrieve his jacket, there was a risk that Sund could destroy evidence, retrieve a weapon, or even steal items that belonged to Thompson. Resp't's Suppl. Br. at 9. This argument is not persuasive.
When Deputy Larson entered the trailer to retrieve Sund's jacket, there is no evidence in the record to indicate that Deputy Larson believed Sund was armed, his jacket contained a weapon, or that Sund would have entered the trailer to destroy evidence. Absent such beliefs, a reasonable person would conclude that there was no immediate need for assistance for health or safety concerns. Further, the need to retrieve Sund's jacket from the trailer does not outweigh Thompson's privacy interest in the trailer. Thus, Deputy Larson was not properly using the community caretaking function when he retrieved Sund's jacket from the trailer.
The State fails to meet its burden of proving that retrieval of Sund's jacket was a proper use of the community caretaking function as an exception to the warrant requirement. Therefore, evidence obtained from this entry into the trailer should have been suppressed.

Consent to Search
Another exception to the warrant requirement is consent to search. State v. Walker, 136 Wash.2d 678, 682, 965 P.2d 1079 (1998). It is the State's burden to establish that a consent to search was lawfully given. Id. In order to meet this burden, three requirements must be met: (1) the consent must be voluntary, (2) the person consenting must have the authority to consent, and (3) the search must not exceed the scope of the consent. Id. Here there is no question that the consent to search the boathouse given by Thompson's father was voluntary; nor is there any argument that the search that followed entry exceeded the scope of the consent. Thus, the sole issue in determining the validity of the consent here is the requirement for the person consenting to have the authority to consent.
In United States v. Matlock, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court held that consent of an individual who possesses "common authority" over the area being searched is valid even though another person with whom that authority is shared is absent from the premises and therefore unable to consent. This court adopted the Matlock common authority standard in State v. Mathe, 102 Wash.2d 537, 688 P.2d 859 (1984). To establish lawful consent by virtue of common authority: (1) a consenting party must be able to permit the search in his own right and (2) it must be reasonable to find that the defendant has assumed the risk that a co-occupant might permit a search. Id. at 543-44, 688 P.2d 859. The Mathe court further elaborated on this standard by stating that the two elements are closely intertwined. Id. at 544 n. 1, 688 P.2d 859. "If a person [consenting to the search] has joint control over an area, it may be proper to presume that the defendant reasonably assumes the risk that the joint control may be authorized to allow a search." Id.
In Mathe, the defendant and his girl friend rented two bedrooms from a landlord's home. Id. at 539, 688 P.2d 859. The landlord consented to the police search of his house in which the defendanta burglary suspectand his girl friend were found in one of the bedrooms. Id. The bedroom was exclusively used by the defendant, and the defendant paid rent for the use of the bedroom. Id. at 541, 688 P.2d 859. The landlord neither used nor had possessions stored in that room. Id. This court found that in those circumstances the landlord could not consent to a search because the tenant was in undisputed sole possession of the premises. Id. at 544, 688 P.2d 859. Therefore, the landlord could not be deemed a co-occupant under the common authority standard and he was not able to permit a search in his own right.
The consent rule enunciated in Matlock, and adopted by Mathe, applies to the *234 validity of the consent of one holding common authority with an absent, nonconsenting individual. However, in State v. Leach this court held that if "the cohabitant be present and able to object, the police must also obtain the cohabitant's consent." 113 Wash.2d 735, 744, 782 P.2d 1035 (1989) (emphasis added). In Leach, the defendant and his girl friend ran a travel agency together. Although the defendant was the owner and operator of the agency, his girl friend had a key to the office, performed minor tasks for the agency, her name appeared on the lease of the premises, and her name also appeared on business cards as an "owner." The girl friend informed the police that the defendant was responsible for the rash of burglaries that occurred in the complex where the travel agency was located. She escorted the police into the agency's office using her key. The defendant was present when police arrived and was placed under arrest. During their search, the police discovered stolen property linked to the reported burglaries. This court held that the search was improper because the police should have obtained the defendant's consent since he possessed at least equal control over the premises and was present at the time of the search. Id.
This issue was further examined in Walker where the nephew of a married couple was caught with a bag of marijuana at school. The nephew told police that he lived with his aunt and uncle and obtained the marijuana from their home. 136 Wash.2d at 679, 965 P.2d 1079. He also told police that more marijuana could be found in the home. Id. The aunt signed a consent form to search the home and accompanied police to her home. Id. at 680, 965 P.2d 1079. Before the police entered the home, the uncle arrived. Id. at 680-81, 965 P.2d 1079. Without obtaining his consent, the police entered the home and found additional marijuana. Id. at 681, 965 P.2d 1079. This court held that while the consent was valid against the aunt, it was not valid against the uncle since he was a co-occupant, with equal control over the premises, and had not given his consent. Id. at 686, 965 P.2d 1079.
Given the evidence at hand, under the common authority standard as enunciated in Matlock and Mathe we conclude that Thompson was not a co-occupant of the boathouse with equal control over those premises and, that unlike the circumstances in both Leach and Walker, his consent was not required to validate the search.
To qualify as a co-occupant, it must be shown that Thompson had equal control over the premises with his parents, i.e., that he would have been able to permit the search in his own right. To be able to permit a search in his own right, it must be established that Thompson had joint access or control of the boathouse for most purposes. See Matlock, 415 U.S. at 172, 94 S.Ct. 988, n. 7. The record does not support such a conclusion. The boathouse was on property owned by Thompson's parents. Thompson was living on another part of his parents' property in a travel trailer that was also owned by them. RP at 11, 45. He did not pay rent to his parents, and as testimony proved, he neither occupied the boathouse nor was it available to him for his exclusive use. RP at 16-17, 45. Although his parents allowed Thompson to store items in the boathouse, his parents did as well, and there is no evidence in the record to show that Thompson was ever in exclusive control of the boathouse. Thompson's use of the boathouse was clearly dependent upon the permission of the owners, i.e., his parents. Thus, while Thompson and his parents each had access to the boathouse, his right to access, as a nonoccupying nonowner, was subordinate to his parents. Therefore, under the common authority standard, Thompson does not qualify as a co-occupant who had equal access and control over the boathouse.
By contrast, it is clear that the parties in Leach and Walker were co-occupants since they possessed equal control and access over the searched premises. Although in Leach the defendant was the employer of the girl friend and was the sole owner of the travel agency, the couple held her out to be "co-owner" of the premises and she was a signatory to the lease of the searched premises. Therefore, to an observer, the defendant and his girl friend had joint control and access over the searched premises. In Walker, joint control and access was apparent because *235 the husband and wife defendants were owners of the searched home and the room being searched was their joint bedroom. Here, however, Thompson does not enjoy such status. Thompson, an adult son, was living on a portion of his parents' property rent free. This type of relationship does not equate to Thompson possessing joint control over all his parents' property. As stated above, his access to the boathouse was contingent upon his parents' permission. Because he lacked the authority to do so, Thompson could not have permitted the search in his own right.[3] Therefore, we find that Thompson did not possess common authority over the boathouse and that his consent was not necessary to the validity of the search.

Suppression of Evidence
Following the elder Thompsons' consent, Deputy Harms entered the boathouse and conducted an initial scan of the premises for officer safety. RP at 77. In plain view, he observed the following: small jars containing different types of liquid; coffee filters; mason jars containing coffee filters and "white powder"; electric hot plates; tubing; rock salt; pie plates with white residue; bottles of liquid ammonia; glassware; starting fluid; empty HC1 gas generator; five-gallon buckets containing unknown fluid, one with a syringe floating in it; bag containing "rough" pseudoephedrine tablets; and an empty bottle of isopropyl alcohol. RP at 78. Based on his experience, Deputy Harms suspected that the boathouse was being used as a methamphetamine lab, discontinued further observation, and sought a search warrant. Id. at 79.
Deputy Harms also observed certain items in open view in other parts of the property. "The mere observation of that which is there to be seen does not necessarily constitute a search." State v. Seagull, 95 Wash.2d 898, 901, 632 P.2d 44 (1981). It is clear that the police with legitimate business may enter areas of curtilage which are impliedly open. In so doing, the police are free to use their senses. Id. Here, Deputy Harms observed a propane tank with a bluish corrosion on the valve near the front of Thompson's trailer. Deputy Harms testified that such a corrosion indicates the tank had been illegally used to store anhydrous ammonia, which is a necessary chemical used in the production of methamphetamine. Deputy Harms also found charred blister packs from pseudoephedrine packaging in a burn barrel located on the property near the trailer. Deputy Harms further observed other burn piles on the property which contained stripped lithium battery pieces and some empty bottles of pseudoephedrine that had the bottoms removed. Both lithium metal and pseudoephedrine are main ingredients in methamphetamine production. Deputy Harms was able to view all of these items from a lawful vantage point.
The items discovered in the boathouse following a lawful consent to search by Thompson's father together with the items found in open view on the property clearly established probable cause for the search warrant independent of items discovered in Thompson's trailer. Therefore, the evidence obtained through the valid search warrant should not have been suppressed at trial. See State v. Coates, 107 Wash.2d 882, 888, 735 P.2d 64 (1987) (excluding tainted evidence, independently found evidence established probable cause for the search warrant).

III
Thompson's conviction was based, at least in part, on evidence found within the trailerevidence we here conclude is inadmissible. This constitutional error may be considered harmless if we are convinced beyond a reasonable doubt that any reasonable trier of fact would have reached the same result despite the error. State v. Brown, 140 Wash.2d 456, 468-69, 998 P.2d 321 (2000). To make this determination, we utilize the "overwhelming untainted evidence" test. State v. Smith, 148 Wash.2d 122, 139, 59 P.3d 74 (2002). Under this test, we consider the untainted evidence admitted at trial to determine if it is so overwhelming *236 that it necessarily leads to a finding of guilt. Id.
In this case, evidence from the boathouse which should have been considered by the trial court was not admitted. Therefore, there is no other untainted evidence upon which we can rely on to conclude that Thompson's conviction should be affirmed. Therefore, it is impossible for us to find that the error in this case was harmless.
Because the introduction of the evidence found in the trailer does not constitute harmless error, we vacate Thompson's conviction for unlawful manufacture of a controlled substance and remand for a new trial consistent with this opinion.
ALEXANDER, C.J., JOHNSON, MADSEN, IRELAND, and OWENS, JJ., concur.
SANDERS, J. (dissenting).
I fully agree with the majority insofar as it reverses the Court of Appeals and holds (1) Washington's knock and wait statute, RCW 10.31.040, unambiguously limits itself to criminal actions, thereby prohibiting a police officer from forcing open a Washington resident's home under authority of a civil arrest warrant, and (2) Deputy Sheriff Terrill Larson's entrance into James Thompson's[1] trailer to retrieve a guest's jacket did not fall within the community caretaking function exception to the warrant requirement of the fourth amendment[2] to the federal constitution or article I, section 7 of our state constitution.[3]See majority at 232-233. Based on these conclusions alone, the discussion should end and the majority should remand for dismissal, as all evidence subsequently obtained in the investigation was gathered as a result of Deputy Larson's unlawful search.
But instead the majority unnecessarily continues its analysis, diverting from its principled application of constitutional jurisprudence to hold the police did not need James' consent to search the boathouse located on his father's property (John Thompson), even though James was present and able to object to his father's consent. The majority exacerbates its error by completely ignoring the "fruit of the poisonous tree" doctrine and engaging in a harmless error analysis, which until today has been a doctrine limited to constitutional errors committed at trial, such as erroneous jury instructions and confrontation clause violations. But even if the evidence obtained from the boathouse was not the fruit of Deputy Larson's unlawful search, his failure to obtain James' consent prior to searching the boathouse mandated he procure advance judicial approval before initiating his search. I would remand for dismissal.

I. Fruit of the Poisonous Tree
Despite the majority's reluctance to discuss the issue, I believe proper application of the "fruit of the poisonous tree" doctrine prohibits admission of any evidence acquired at the Thompson residence. Axiomatic in search and seizure jurisprudence is the unavoidable consequence that a court must suppress "`all subsequently uncovered evidence [because such evidence] becomes fruit of the poisonous tree.'" State v. Kinzy, 141 Wash.2d 373, 393, 5 P.3d 668 (2000) (quoting State v. Ladson, 138 Wash.2d 343, 359, 979 P.2d 833 (1999)). In determining whether specific evidence is or is not fruit of a tree poisoned by police misconduct, the question is not whether
all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently *237 distinguishable to be purged of the primary taint."

Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (emphasis added) (quoting JOHN MACARTHUR MAGUIRE, EVIDENCE OF GUILT 221 (1959)), quoted in State v. Hicks, 76 Wash.2d 80, 81, 455 P.2d 943 (1969).
Here the majority rightfully acknowledges Deputy Larson's search of James' trailer was unlawful because he intruded into that home without benefit of a warrant or a proper exception thereto. Majority at 232-233. Certainly there is no dispute the evidence seized directly from the trailer must be suppressed. See id. at 233. However the majority disregards these well-settled principles to engage in a harmless error analysis, citing State v. Smith, 148 Wash.2d 122, 59 P.3d 74 (2002), and State v. Brown, 140 Wash.2d 456, 998 P.2d 321 (2000), to support its conclusion. Majority at 235. Neither of those cases involved unconstitutional searches or seizures, but rather involved errors which occurred at trial. See Smith, 148 Wash.2d at 130, 138-39, 59 P.3d 74 (holding defendant's confrontation rights violated and constitutional error not harmless); Brown, 140 Wash.2d at 468-69, 998 P.2d 321 (erroneous jury instruction violated due process, but error was harmless). Indeed, search and seizure law has its own vehicle for admitting untainted evidence, namely the independent source doctrine and inevitable discovery doctrine. E.g., State v. Smith, 113 Wash.App. 846, 855-56, 55 P.3d 686 (2002), review denied, 149 Wash.2d 1014, 69 P.3d 876 (2003) (unlawful intrusion into defendant's property violated constitutional rights, but evidence nonetheless admissible as it was discovered from a source independent of police error).
Even if the majority were to engage in such an independent source or inevitable discovery analysis rather than its harmless error inquiry, such an argument would fail because of the inexorable causal chain resulting from Deputy Larson's unconstitutional search. The sole purpose of Deputy Larson's trip to the Thompson residence was to arrest James for failing to pay child support and attend a show cause hearing. Clerk's Papers (CP) at 82 (finding of fact (FF) 3).[4] This was done at the request of James' father, John. CP at 81-82 (FF 2-3). Once Deputy Larson had arrested James and placed him in the patrol car, there was no reason to remain on the Thompson property. But Larson's unlawful search resulted in the discovery of "a container that had white crystalline residue cooked onto it." Verbatim Report of Proceedings (VRP) (Feb. 27, 2001) at 41. Using his detective skills, Deputy Larson concluded the residue was methamphetamine, prompting him to speak with James' father. Id. at 42-43. The purpose of that conversation was twofold, as affirmed by Deputy Larson's testimony at the suppression hearing: first, Deputy Larson "wanted to let [John] Thompson know that [he] did what [John] asked," and second, which was "the main purpose, was to go up and try to find out where Mr. [Eric] Sund had gone." Id. at 43-44. Larson testified he wanted to find Sund, who was present in the trailer that was subject to the unlawful search, "[b]ecause there was methamphetamine residue and items inside the trailer that he was in, and I was going to grab him and arrest him also." Id. at 44 (emphasis added). And it was this desire to hunt down Eric Sund that prompted Deputy Larson to search the boathouse where the other incriminating evidence was found.
This is far more than a mere "but for" relationship that is insufficient to bring certain evidence within the realm of the "fruit of the poisonous tree." Cf. Wong Sun, 371 U.S. at 488, 83 S.Ct. 407. Rather Deputy Larson discovered the evidence in the boathouse by exploiting his unconstitutional search of the trailer, precisely the type of conduct envisioned *238 by Wong Sun that requires suppression of the evidence found.
Indeed the case cited by the majority as justification for holding the search of the trailer unlawful is directly on point. See Kinzy, 141 Wash.2d 373, 5 P.3d 668. There defendant Kinzy, a 16-year-old female, was walking down the street with some older friends, one of whom the police recognized as someone associated with narcotics. Id. at 378, 5 P.3d 668. Police officers initially stopped to inquire about Kinzy's safety because she appeared too young to be walking with that crowd. Id. After Kinzy walked away from the officers the police restrained Kinzy by grabbing her arm and subsequently frisked her for weapons. Id. at 378, 380, 5 P.3d 668. While performing the Terry[5] stop the officer noticed flecks of rock cocaine on Kinzy's coat, prompting a field test which confirmed the identity of the controlled substance as cocaine. Id. at 378, 5 P.3d 668. After the field test Kinzy freely admitted more cocaine was stored in her bra. Id. at 379, 5 P.3d 668. The police then properly informed Kinzy of her Miranda[6] rights and arrested her, resulting in the seizure of the cocaine stored in Kinzy's bra. Id. at 379, 5 P.3d 668. Though the initial stop to investigate Kinzy's safety properly fell within the community caretaking function, we held the officers violated Kinzy's constitutional right to be free from unreasonable seizures once they grabbed her arm and began frisking her for weapons. Id. at 389-91, 5 P.3d 668. This holding led us to conclude all evidence discovered by the police as a result of the unconstitutional seizure was "fruit of the poisonous tree" and therefore constitutionally banned from admission. Id. at 393., 5 P.3d 668 We held:
In this case, evidence of cocaine was discovered only after (1) seizure of Petitioner, (2) the pat-down frisk of Petitioner, (3) the seizure of cocaine flecks, and (4) Petitioner's admission that she had more cocaine in her "bra." Petitioner correctly claims before this Court that her seizure by Respondent was unconstitutional, and thus the subsequently discovered cocaine became the "fruit of the poisonous tree."
Id. (emphasis added).[7] It is no argument to say John Thompson's purported consent dissipated the taint caused by the unlawful search of the trailer, just as it was no argument that the police saw the flecks of cocaine in plain view[8] on Kinzy's coat or discovered the additional cocaine in Kinzy's bra pursuant to a search incident to an otherwise lawful arrest.[9]See id. at 383-84, 5 P.3d 668. To the contrary, Deputy Larson's unconstitutional invasion of James' trailer instigated his pursuit of Eric Sund which resulted in the search of the boathouse. By exploiting his unlawful discovery in the trailer, Deputy Larson remained at the Thompson residence for a time much longer than was initially necessary to complete the task at hand: arresting James Thompson pursuant to a civil arrest warrant.
Consistent with the majority's holding, Judge Armstrong dissented in the Court of *239 Appeals decision below, concluding that majority erred by holding the community caretaking function justified Deputy Larson's intrusion into James' trailer. See State v. Thompson, 112 Wash.App. 787, 803-05, 51 P.3d 143 (2002) (Armstrong, J., dissenting). The majority of that court did not discuss the fruit of the poisonous tree doctrine because it found no constitutional infirmity with Deputy Larson's search. Id. at 796-97, 51 P.3d 143. That this majority elects to overturn that holding compels the conclusion reached by Judge Armstrong, with which I agree: "[B]ecause everything that followed was based upon what the officer learned from the entry, all the evidence of drug manufacturing should have been suppressed." Id. at 805, 51 P.3d 143 (Armstrong, J., dissenting) (citing Wong Sun, 371 U.S. at 484-85, 83 S.Ct. 407; State v. White, 97 Wash.2d 92, 111-12, 640 P.2d 1061 (1982)). That should end this case.

II. Consent
Notwithstanding the obligation to suppress all evidence from the boathouse pursuant to the taint caused by the unlawful search of the trailer, the majority further errs by upholding the boathouse search in its own right, as James' additional consent was necessary to justify the police's failure to procure a warrant prior to the search.
I begin with the fundamental and well-settled presumption that all warrantless searches are per se unreasonable under both the Fourth Amendment and article I, section 7. Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); State v. Duncan, 146 Wash.2d 166, 171, 43 P.3d 513 (2002); State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980). And only when the State affirmatively demonstrates its warrantless intrusion meets one of the exceptions to this constitutional requirement may we uphold the search. Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); Duncan, 146 Wash.2d at 171, 43 P.3d 513. The claimed exception here is consent, which vitiates the warrant requirement only if properly obtained by the State. State v. Walker, 136 Wash.2d 678, 682, 965 P.2d 1079 (1998). However we must never abandon the principle that proving consent "is no easy task because `[t]he exceptions to the requirement of a warrant, including consent, are "jealously and carefully drawn."'" State v. Ferrier, 136 Wash.2d 103, 111, 960 P.2d 927 (1998) (quoting State v. Hendrickson, 129 Wash.2d 61, 72, 917 P.2d 563 (1996) (quoting State v. Bradley, 105 Wash.2d 898, 902, 719 P.2d 546 (1986))). Proof of consent occurs only upon an affirmative showing three factors exist: (1) consent is voluntarily given; (2) the person who consented to the search had authority to do so; and (3) the search does not exceed the scope of the consent. Id. The first and third requirements are undisputedly met, thus necessitating sole consideration of the second prongwhether John Thompson had unilateral authority to consent to the warrantless search.
Where two or more persons contemporaneously occupy a home, consent from one binds the other and the police may lawfully search the premises so long as the nonconsenting co-occupant is absent from the scene. United States v. Matlock, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Leach, 113 Wash.2d 735, 782 P.2d 1035 (1989). But this court unequivocally held in Leach that when more than one co-occupant is present and able to object to another's consent, the State must attain consent from each and every present co-occupant to escape the warrant requirement. 113 Wash.2d at 744, 782 P.2d 1035.
Leach is on all fours, despite the majority's claim to the contrary. There defendant Leach owned and operated a travel agency at which his live-in girl friend worked. Id. at 737, 782 P.2d 1035. Suspicious that Leach had engaged in several earlier burglaries, the girl friend escorted police to the agency, unlocked the door, and granted police consent to search the premises. Id. Though Leach was present when the police arrived, the police did not ask for his consent to search the office. Id. at 737-38, 782 P.2d 1035. We held the girl friend's consent insufficient to escape the presumption of unreasonableness, stating:
Where the police have obtained consent to search from an individual possessing, at *240 best, equal control over the premises, that consent remains valid against a cohabitant, who also possesses equal control, only while the cohabitant is absent. However, should the cohabitant be present and able to object, the police must also obtain the cohabitant's consent. Any other rule exhalts [sic] expediency over an individual's Fourth Amendment guaranties. Accordingly, we refuse to beat a path to the door of exceptions.
Id. at 744, 782 P.2d 1035 (emphasis added). Undeniably the consent given by Leach's girl friend would have been sufficient had Leach, the other co-occupant, been absent when the search was conducted. Matlock, 415 U.S. at 171, 94 S.Ct. 988; see also Leach, 113 Wash.2d at 739, 782 P.2d 1035. But Leach's presence at the scene invalidated the warrantless search because the police failed to obtain his consent. Leach, 113 Wash.2d at 744, 782 P.2d 1035 ("Thus, when confronted with Mr. Leach's presence, not having obtained a warrant, the officer should have requested Mr. Leach's consent, as well."). Similarly in Walker the Court of Appeals upheld the trial court's suppression of evidence obtained in a search executed through consent given by the defendant's wife (who was a codefendant), even though this court eventually ruled over my dissent such evidence was admissible against the wife. See State v. Walker, 86 Wash.App. 857, 863, 941 P.2d 1 (1997), rev'd on other grounds, 136 Wash.2d 678, 965 P.2d 1079 (1998). Though the State did not seek review of the Court of Appeals' affirmance of the trial court's suppression order to the husband, this court indicated agreement with that portion of the holding by stating, "It follows from [Leach] that because Ellen and Gus [Walker] were cohabitants and both present during the search, Ellen's consent to the search was invalid as to Gus." Walker, 136 Wash.2d at 684, 965 P.2d 1079.
Here it is undisputed James was present at the home when James' father permitted Deputy Larson to search the boathouse on the property. Yet the majority holds James' consent was unnecessary to authorize this search because, in the majority's view, James did not have "joint access or control of the boathouse for most purposes." Majority at 234. To the contrary we must accept as a verity[10] the trial court's finding that James "share[d] the use of the boathouse with his parents who live in the main house on the property." CP at 84 (FF 13). Indeed James' mother testified at the suppression hearing that James was the only person to use the boathouse for over a year prior to the search in question, as the family used the boathouse to store a tractor that only James used. See VRP (Feb. 27, 2001) at 23-24. James' mother further affirmed her son had permission to use the boathouse because "it was part of the property." Id. at 16, 965 P.2d 1079. There is no evidence in the record indicating James' access to the boathouse was restricted in any way, and it is James' unfettered access to the boathouse which brings him within the realm of a co-occupant. See Matlock, 415 U.S. at 171, 94 S.Ct. 988, n. 7.
However the majority disregards these facts because the record does not disclose "[James] Thompson was ever in exclusive control of the boathouse." Majority at 234 (emphasis added). I cannot disagree with this factual assertion, as James' parents undoubtedly possessed the authority to use the boathouse. But this detail is wholly irrelevant. Not one case cited by the majority requires a person to possess "exclusive authority" over property in order to have "common authority" to grant the police consent to search.[11] In fact, the term "common authority" implies just the oppositethat there is mutual authority over the propertywhich is precisely what the United States Supreme Court stated in Matlock when describing the term:
Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The *241 authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
Matlock, 415 U.S. at 171, 94 S.Ct. 988, n. 7 (emphasis added), quoted in City of Seattle v. McCready, 124 Wash.2d 300, 306, 877 P.2d 686 (1994), and Leach, 113 Wash.2d at 739, 782 P.2d 1035. Had James' father possessed exclusive authority, then I would be inclined to agree that James was not a co-occupant and his consent would be unnecessary. See State v. Mathe, 102 Wash.2d 537, 544, 688 P.2d 859 (1984) (landlord did not have authority to consent to police search of tenant's property "when the tenant is in exclusive possession of the property").
But the record discloses it was James who continuously used the boathouse without need of additional permission each time. I posit the majority would have no problem upholding a consensual search were the roles reversed and the police obtained James' consent to search the boathouse to find evidence against his father who was, hypothetically speaking, absent from the scene. I too would uphold such a search pursuant to Matlock because James possessed the right to permit such a search due to his continuous and unfettered use of the boathouse over the previous year. In the instant case, however, it is this right James possessed himself which compels the police to procure his consent to search the boathouse as he was present at the scene and able to object.
The majority's further justifications for holding James' consent unnecessary are equally unpersuasive. The majority first relies on the fact "[t]he boathouse was on property owned by [James] Thompson's parents." Majority at 234. Mere ownership is not a requisite element to finding common authority, and citation to both Matlock and Mathe provide all the support to rebut the majority's proposition. Matlock, 415 U.S. at 170-71, 94 S.Ct. 988 (cotenant who did not own property could grant consent); Mathe, 102 Wash.2d at 543-44, 688 P.2d 859 (landlord could not give valid consent against tenants, even though he owned the property, because it was the tenants who exclusively used the apartment).
The majority further justifies its holding by pointing to evidence in the record detailing "[James] Thompson was living on another part of his parents' property in a travel trailer that was also owned by them." Majority at 234. True enough, but under this logic James' mother and father would also lack common authority because the main house in which they lived was separate from the boathouse. Yet the majority finds those two held common authority over the boathouse (and properly so). I do not see how geographical proximity to a person's living quarters becomes a relevant factor in determining whether or not a person has authority to consent to a search of a piece of property, and the majority provides no authority to persuade me otherwise. Were it a relevant factoras opposed to "joint access or control for most purposes" as stated in Matlock, 415 U.S. at 171, 94 S.Ct. 988, n. 7then courts would hold the neighbor whose bedroom is 200 feet from a shack on the outer skirts of a person's property would have greater authority to consent to a search of the shack than the owner of the shack who uses it daily, merely because the latter's bedroom is 300 feet away. Such is absurd.
The final justification proffered by the majority is James' nonpayment of rent to his parents. Majority at 234. Were this a proper consideration then no 18-year-old living at home during his or her break from college in the summer months could give the police consent to search his parents' living room. The young adult, despite his or her majority age, would be incapable of granting consent merely because no rental funds are transferred to mom and dad. Yet this runs in counterdistinction to a line of cases, including one from our own Court of Appeals, which allow minors to validly consent to a police search given the right circumstances. See *242 State v. Jones, 22 Wash.App. 447, 451-52, 591 P.2d 796 (1979) (upholding a 13-year-old's consent to enter the home, where police saw incriminating evidence in plain view);[12]see also Davis v. United States, 327 F.2d 301, 304 (9th Cir.1964) (eight-year-old validly consented to police entry into home); Doyle v. State, 633 P.2d 306, 309 (Alaska Ct.App.1981) (consent of defendant's son who was between ages of 11 to 14 sufficient to justify warrantless entry into defendant's apartment); People v. Holmes, 180 Ill.App.3d 870, 536 N.E.2d 1005, 1007, 129 Ill.Dec. 955 (1989) (defendant's 11-year-old daughter validly consented to permit search of backyard where police found controlled substances growing in plain view, though court granted new trial because of juror bias); State v. Lotton, 527 N.W.2d 840, 843-44 (Minn.Ct.App.1995) (reversing trial court's suppression of evidence, holding defendant's 10 year-old daughter validly consented to police entry into apartment). Certainly these young adolescents were not submitting monthly payments in exchange for a roof over their heads.[13] Indeed, not one of those cases discussed or considered whether the minor paid rent. While this court has yet to tackle the issue of a minor's ability to give consent (and I reserve judgment on that issue until it is properly presented), I do not foresee an inquiry into the minor's ability to pay rent will govern the disposition of the matter once it arrives at the Temple of Justice's doorstep. As such, the majority's reliance on James' failure to pay rent to his parents is improper.
Rather I would simply follow the test laid out by the United States Supreme Court in Matlock and adopted by this court in Mathe: whether James had "joint access or control [of the boathouse] for most purposes." Matlock, 415 U.S. at 171, 94 S.Ct. 988 n. 7; see also Mathe, 102 Wash.2d at 543, 688 P.2d 859. The evidence here shows James was the only member of his family who had used the boathouse for the previous year, as the family used it to store the tractor exclusively used by James. Because he had "joint access" to the boathouse, Matlock, 415 U.S. at 171, 94 S.Ct. 988 n. 7, he was a co-occupant of the boathouse. And under Leach his presence at the scene required the police to obtain his consent before searching that property. Leach, 113 Wash.2d at 744, 782 P.2d 1035. The police's failure to do so signals the State's failure to overcome the presumption of unreasonability.

CONCLUSION
As Leach explained, "`Where the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so.'" 113 Wash.2d at 744, 782 P.2d 1035 (quoting United States v. Impink, 728 F.2d 1228, 1231 (9th Cir.1984)). Despite the fact James Thompson was restrained in handcuffs and posed no threat to destroy any evidence the police might have subsequently found in the boathouse, the police did not take the necessary steps to seek advance approval from a judicial officer before entering James' private affairs. Yet the majority excuses the State's failure to seek advance judicial approval, regressing from our holding in Leach to impose new considerations of rent, ownership, and geographical proximity. I find this to be an abdication of our judicial duty to uphold privacy over law enforcement convenience, individual liberty over investigatory expediency, and independence over government oppression. Moreover this abdication is wholly unnecessary due to the ubiquitous taint caused by the unlawful search of James' trailera search not one member of this court finds consistent with the protections afforded by the Fourth Amendment and article I, section 7. Finally, the majority's interjection of the harmless error analysis into search and seizure jurisprudence is an unprecedented and unsupportable step which *243 adds confusion and disarray to well-settled law.
The warrant requirement may be an inconvenience to the State, but it is a necessary and constitutionally required inconvenience that the judiciary must fervently protect, as affirmed by the Supreme Court over 30 years ago:
"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (emphasis added) (quoting Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). Every inch this court yields to government encroachment is one more inch of privacy and liberty the Washington citizens must yield in consequence.
For these reasons, I dissent.
CHAMBERS and FAIRHURST, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] This statute was recently amended. However, the substance of the statute is intact. LAWS OF 2003, ch. 53, § 331.
[3] Since it is clear that Thompson cannot permit a search of the boathouse in his own right, it is unnecessary to examine the second prong of the common authority standard.
[1] I will refer to both James Thompson and his father, John, by their first names to avoid confusion.
[2] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. IV.
[3] "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7.
[4] No error was assigned to this finding, rendering it a verity. State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994); State v. Vidor, 75 Wash.2d 607, 608, 452 P.2d 961 (1969). Though to the Court of Appeals James assigned error to numerous findings of fact found at the suppression hearing, the appellate court there held all findings to be verities because of James' failure to provide evidentiary support for his challenges. State v. Thompson, 112 Wash.App. 787, 791 n. 1, 51 P.3d 143 (2002). He did not seek further review in this court of that holding, thereby rendering all findings of fact verities here. Kinzy, 141 Wash.2d at 382, 5 P.3d 668.
[5] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] Though only four justices, myself included, signed the majority in Kinzy, Justice Madsen's concurrence did not deviate from the majority's application of the fruit of the poisonous tree doctrine. See Kinzy, 141 Wash.2d at 396-97, 5 P.3d 668 (Madsen, J., concurring). Rather Justice Madsen expressed her reservations joining the opinion which "state[d] that abuse of the [community caretaking function] [would] not occur `so long as police officers have a reasonable, articulable suspicion of criminal activity before undertaking a stop which leads to detention, search and seizure.'" Id. at 397, 5 P.3d 668 (Madsen, J., concurring) (quoting id. at 393, 5 P.3d 668). Regardless of Justice Madsen's views on the breadth of the Kinzy majority's language, her concurrence lends a fifth justice to hold the unlawful detention of defendant Kinzy compelled suppression of all evidence as tainted fruit. See Davidson v. Hensen, 135 Wash.2d 112, 128, 954 P.2d 1327 (1998) ("Where there is no majority agreement as to the rationale for a decision, the holding of the court is the position taken by those concurring on the narrowest grounds.").
[8] See State v. O'Neill, 148 Wash.2d 564, 582-83, 62 P.3d 489 (2003) (evidence discovered by police in plain view is excepted from general warrant requirement).
[9] See State v. Vrieling, 144 Wash.2d 489, 492, 28 P.3d 762 (2001) (search incident to lawful arrest valid exception to warrant requirement).
[10] See supra p. 237 n. 4.
[11] E.g., Matlock, 415 U.S. at 170-72, 94 S.Ct. 988 (consent of cotenant with common authority sufficient to justify warrantless search); State v. Mathe, 102 Wash.2d 537, 544, 688 P.2d 859 (1984) (warrantless search based upon landlord's consent unconstitutional because landlord lacked authority in his own right to consent to search current tenant's bedroom).
[12] Jones nonetheless overturned the defendant's sentence, finding a subsequent unlawful seizure of property reduced the value below the then $250 threshold to convict a person of possessing stolen property in the second degree.
[13] In fact, parents have a duty to provide shelter for their children, and the failure to do so results in criminal mistreatment. See RCW 9A.42.020.037 (crime to withhold the "basic necessities of life"); see also RCW 9A.42.010(1) (including "shelter" among "basic necessities of life"); see also State v. Jackson, 137 Wash.2d 712, 729, 976 P.2d 1229 (1999).