# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70262-9-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| BRANDON WILLIAM DENNIS, | ) | UNPUBLISHED |
| | ) | |
| Respondent. | ) | FILED: August 4, 2014 |
| | ) | |

COX, J – Warrantless searches of constitutionally protected areas are presumptively unreasonable absent proof by the State that one of the well-established exceptions applies.[1] In this case, the State fails in its burden to prove that the emergency aid exception authorized the protective sweep the responding deputies conducted on the top floor of Brandon Dennis's home. At the time of the sweep, Dennis was detained on the main floor of the home but was not under arrest. Additionally, the State does not point to articulable facts

---

[1] Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); State v. Ladson, 138 Wn.2d 343, 349, 979 P.2d 833 (1999).

that would "'warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger'" to those on the scene.[2] Accordingly, the firearm evidence the deputies seized during the protective sweep of the top floor must be suppressed. We affirm.

The unchallenged written findings of fact from the CrR 3.6 suppression hearing provide context and are verities on appeal.[3]

On September 5, 2012, someone called 911 and reported that Dennis was at that person's residence in Issaquah, appeared to be intoxicated, and made threats that he was going to shoot himself.

When responding officers arrived at the residence, the reporting party told them that Dennis had left in his vehicle. They also learned that Dennis "owns/possesses firearms" and was returning to his own residence. The officers further learned that Dennis had recently made a post on Facebook stating "FTW," which the officers understood to mean "F*** the World."

The officers ran Dennis's license plate numbers and obtained his home address in Maple Valley. Three King County Sheriff deputies were dispatched to that address.

When the deputies arrived at his home, they saw that Dennis's vehicle was parked in the driveway and "the grill was warm to the touch." The deputies knocked and announced themselves at the front door, but no one responded.

---

[2] State v. Hopkins, 113 Wn. App. 954, 960, 55 P.3d 691 (2002) (quoting Maryland v. Buie, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)).

[3] State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

The deputies walked around the home and looked through windows, but they did not see anyone. The garage door was open.

The deputies went through the garage and knocked on the interior garage door, but no one responded.

Believing that Dennis could be home and that he might harm himself, they entered the home while repeatedly announcing themselves.

As they continued to search the main floor of the home looking for Dennis, one deputy saw Dennis emerge from a top floor bedroom. That deputy testified at the hearing that Dennis was "slow moving," "calm," and "subdued." He ordered Dennis to kneel. There was no gun on Dennis. The deputy ordered Dennis to come down the stairs to the main level of the home. He handcuffed Dennis, detained him on the sofa, but did not arrest him.

Once Dennis was detained on the main level of the home, the other two deputies conducted a sweep of the top floor. Upon entering the bedroom that Dennis had exited, the deputies saw and seized a pistol partially underneath a blanket on the bed. They also seized an AR-15 assault rifle that was in the corner of the bedroom behind a door.

Once the deputies found the two firearms and the other deputy confirmed that Dennis was a convicted felon, they arrested him. The State then charged Dennis with one count of first degree unlawful possession of a firearm.

Dennis moved to suppress the evidence of the firearms. He argued that the deputies' contact with him was pretextual, that they did not lawfully enter his home, and that they exceeded the scope of the emergency aid exception.

The trial court concluded that the deputies validly entered Dennis's home under the emergency aid exception. But it ruled that they exceeded the scope of the exception when they conducted a search of the top floor and seized the firearms located there. Because there was no other evidence to support the charge, the trial court granted Dennis's motion to suppress the evidence of the firearms and terminated the case.

The State appeals.

## EMERGENCY AID EXCEPTION

The State argues that the trial court erred when it concluded that the deputies' search of the home's top floor was unlawful. Specifically, it contends that the deputies' warrantless search was part the community caretaking or emergency aid exception and was a lawful protective sweep. We disagree.

This court reviews a trial court's decision on a motion to suppress to determine whether the findings are supported by substantial evidence and whether those findings, in turn, support the conclusions of law.[4] This court reviews conclusions of law de novo.[5]

The Fourth Amendment of the United States Constitution and article I, section 7 of the Washington State Constitution prohibit unreasonable searches and seizures.[6] Under the Washington State Constitution, "[T]he home is a 'highly

---

[4] State v. Schultz, 170 Wn.2d 746, 753, 248 P.3d 484 (2011).

[5] Id.

[6] State v. Williams, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984).

4

private place' and 'receives heightened constitutional protection.'"[7] Subject to

"'jealously and carefully drawn'" exceptions, a warrantless search is

unreasonable.[8]

The emergency aid exception to the warrant requirement "'allows for the

limited invasion of constitutionally protected privacy rights when it is necessary

for police officers to render aid or assistance.'"[9] "This exception emerges from

the police's 'community caretaking function' . . . ."[10] It is "divorced" from a

criminal investigation.[11]

The State bears the burden of establishing an exception to the warrant

requirement.[12] For the emergency aid exception, the State must show that:

> "(1) the police officer subjectively believed that someone likely
> needed assistance for health or safety concerns; (2) a reasonable
> person in the same situation would similarly believe that there was
> need for assistance; and (3) there was a reasonable basis to
> associate the need for assistance with the place being searched.". .
> . (4) there is an imminent threat of substantial injury to persons or
> property; (5) state agents must believe a specific person or persons
> or property is in need of immediate help for health or safety

---

[7] State v. Johnson, 104 Wn. App. 409, 415, 16 P.3d 680 (2001) (quoting State v. Young, 123 Wn.2d 173, 185, 867 P.2d 593 (1994)).

[8] State v. Hendrickson, 129 Wn.2d 61, 72, 917 P.2d 563 (1996) (quoting State v. Bradley, 105 Wn.2d 898, 902, 719 P.2d 546 (1986)).

[9] Schultz, 170 Wn.2d at 754 (quoting State v. Thompson, 151 Wn.2d 793, 802, 92 P.3d 228 (2004)).

[10] Id. (quoting Thompson, 151 Wn.2d at 802).

[11] Thompson, 151 Wn.2d at 802.

[12] Schultz, 170 Wn.2d at 754.

reasons; and (6) the claimed emergency is not a mere pretext for an evidentiary search.[13]

"Further, two competing policies come into play when the emergency aid exception is invoked: '(1) allowing police to help people who are injured or in danger, and (2) protecting citizens against unreasonable searches.'"[14] This court must "balance these policies in light of the facts and circumstances of each case."[15]

Here, the trial court concluded that the "deputies validly entered the defendant's residence under the community caretaking exception, specifically under emergency aid." We agree, and the parties do not dispute this part of the court's conclusions of law.

Rather, the issue is whether the deputies exceeded the scope of the emergency aid exception when two of the deputies went upstairs, after Dennis was detained downstairs, and observed the firearms while conducting a sweep.

In State v. Schroeder, Division Two considered whether officers exceeded the scope of the emergency aid exception.[16] It explained:

> "Once the [community caretaking function] exception does apply, police may conduct a noncriminal investigation so long as it is necessary and strictly relevant to performance of the community

---

[13] Id. (quoting Thompson, 151 Wn.2d at 802) (citing State v. Leffler, 142 Wn. App. 175, 181, 183, 178 P.3d 1042 (2007); Ladson, 138 Wn.2d at 349).

[14] State v. Schroeder, 109 Wn. App. 30, 38, 32 P.3d 1022 (2001) (quoting Johnson, 104 Wn. App. at 418).

[15] Id.

[16] 109 Wn. App. 30, 43-46, 32 P.3d 1022 (2001).

6

caretaking function. The noncriminal investigation must end when reasons for initiating an encounter have been fully dispelled."[17]

Stated differently, "'a warrantless search must be strictly circumscribed by the exigencies which justify its initiation.'"[18] "Thus, officers conducting a search under the emergency exception may not exceed 'the scope of a reasonable search to effectuate the purpose of the entry.'"[19]

Here, the purpose of the deputies' entry into the home was to check on Dennis's welfare. This was based on the 911 report that he had made threats to shoot himself. Consequently, the deputies' warrantless search was "'strictly circumscribed'" to assisting Dennis and not anyone else.[20]

Once the deputies detained Dennis on the main floor of his home, the emergency was over. The reason for initiating the encounter—checking on Dennis—had been "'fully dispelled.'"[21] The deputies did not have any other information that would have led them to believe that anyone else was in the home and needed assistance. Thus, they did not have authority under the

---

[17] Id. at 43 (alteration in original) (quoting State v. Kinzy, 141 Wn.2d 373, 395, 5 P.3d 668 (2000)).

[18] State v. Gibson, 104 Wn. App. 792, 797, 17 P.3d 635 (2001) (internal quotation marks omitted) (quoting Mincey v. Arizona, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)).

[19] Id. (quoting State v. Bakke, 44 Wn. App. 830, 841, 723 P.2d 534 (1986)).

[20] Id. at 797 (internal quotation marks omitted) (quoting Mincey, 437 U.S. at 393).

[21] Schroeder, 109 Wn. App. at 43 (quoting Kinzy, 141 Wn.2d at 395).

7

emergency aid exception to go upstairs to conduct a sweep. In short, the deputies exceeded the proper scope of the emergency aid exception by their actions.

The State argues that the deputies were within the scope of the exception because they had no idea if other people or firearms were in the home. It contends that the deputies needed to ensure that no one else needed assistance. These arguments are not persuasive because the scope of a warrantless search under the exception must be "'strictly circumscribed'" by the emergency that justified its initiation.[22] The deputies did not have any information that anyone other than Dennis was in need of assistance when they conducted a sweep of the top floor of the home.

The State also contends that the deputies were allowed to conduct a cursory protective sweep to ensure their safety. This argument goes well beyond the bounds of when a protective sweep is authorized.

In Maryland v. Buie, the United States Supreme Court held that the Fourth Amendment permits protective sweeps.[23] "*While making a lawful arrest*, officers may conduct a reasonable 'protective sweep' of the premises for security purposes."[24] The scope of such a sweep is limited to a "cursory visual inspection

---

[22] Gibson, 104 Wn. App. at 797 (internal quotation marks omitted) (quoting Mincey, 437 U.S. at 393).

[23] 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

[24] Hopkins, 113 Wn. App. at 959 (emphasis added) (citing Buie, 494 U.S. at 334-35).

8

of places where a person may be hiding."[25] "If the area immediately adjoins the place of arrest, the police need not justify their actions by establishing a concern for their safety."[26] But when a sweep extends beyond the immediate area, "'there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those *on the arrest scene*.'"[27] The protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger."[28]

Here, the deputies did not arrest Dennis before the protective sweep. Thus, the threshold requirement of a protective sweep is not met under the circumstances of this case. Rather, the deputies conducted the sweep before the arrest, and the firearms discovered during the sweep led to Dennis's arrest.

The State fails to cite any authority to support its assertion that a protective sweep is allowed in this particular circumstance—where a sweep is conducted without first making an arrest. And the State fails to point to anything in this record to show any valid concerns either for officer safety or the safety of others that might have authorized a protective sweep of the top floor.

---

[25] Id.

[26] Id.

[27] Id. (emphasis added) (quoting Buie, 494 U.S. at 334).

[28] Buie, 494 U.S. at 335-36 (emphasis added).

We acknowledge that a review of federal cases shows that some courts have applied Buie to allow protective sweeps in non-arrest situations.[29] In these situations, the inquiry is whether officers had articulable facts to support their belief that the area to be swept harbors an individual posing a danger to those on the scene.[30] "A general desire to make sure that there are no other individuals present is not sufficient to justify an extended protective sweep."[31]

Here, as we previously stated, the State fails to show that the deputies had a reasonable belief that the top floor of the home harbored anyone posing a danger to them. In fact, the State acknowledges that the "deputies testified that they had *no idea* if other persons lived at the residence or were present."[32] Thus, the State fails to show that the deputies' warrantless search of the top floor was a lawful protective sweep.

The State also contends that a cursory protective sweep should be permitted when officers engage in community caretaking, so that officers and

---

[29] See, e.g., United States v. Spotted Elk, 548 F.3d 641, 651 (8th Cir. 2008); United States v. Martins, 413 F.3d 139, 149-50 (1st Cir. 2005); see also 79 C.J.S. Searches § 120 (2014) ("Although it has been held that arrest is not per se an indispensable element of in-home protective sweep, it has also been held under the Fourth Amendment that there can be no protective sweep without an arrest preceding the sweep.").

[30] See, e.g., Spotted Elk, 548 F.3d at 651; Martin, 413 F.3d at 149-50; United States v. Gould, 364 F.3d 578, 584 (5th Cir. 2004); United States v. Taylor, 248 F.3d 506, 513-14 (6th Cir. 2001); United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993); United States v. Patrick, 959 F.2d 991, 996-97 (D.C. Cir. 1992); United States v. Daoust, 916 F.2d 757, 758-59 (1st Cir. 1990).

[31] State v. Sadler, 147 Wn. App. 97, 126, 193 P.3d 1108 (2008).

[32] Brief of Appellant at 18 (emphasis added).

anyone in the immediate area are safe. But the State fails to cite any authority to support an expansion of the emergency aid or community caretaking exception to allow a protective sweep. Rather, as previously discussed, the scope of the emergency aid exception is "'strictly circumscribed by the exigencies which justify its initiation.'"[33]

The State primarily relies on State v. Sadler to support its assertion that the deputies were conducting a lawful protective sweep.[34] But that case is distinguishable because there was an arrest before the sweep.

There, officers entered Stanley Sadler's home without a warrant.[35] This initial entry was based on the emergency aid exception.[36] The officers subjectively and reasonably believed that a 14-year-old girl, K.T., was in this home and engaged in sadomasochistic sex with Sadler, a significantly older man.[37]

The officers located K.T. in bed and observed the following:

> Once upstairs, Officer Norling saw K.T. laying on a bed in the fetal position. K.T.'s skirt was pulled up to just below her waist. She did not have on any underwear and her buttocks were exposed. Officer Norling also observed chains on the bed frame, leather cuffs on the nightstand, and a vibrator nearby. K.T. appeared to be

---

[33] Gibson, 104 Wn. App. at 797 (internal quotation marks omitted) (quoting Mincey, 437 U.S. at 393).

[34] Brief of Appellant at 13-15 (citing Sadler, 147 Wn. App. 97).

[35] Sadler, 147 Wn. App. at 118-19.

[36] Id. at 124-25.

[37] Id.

sleeping or unconscious, and she was slow to respond when Officer Norling called her name.[38]

After these observations, the officers arrested Sadler.[39] While the court did not use the word "arrest," the court explained that an officer detained, handcuffed, patted down, and took Sadler into custody.[40] Then, the officers proceeded to search the areas that immediately adjoined the place of arrest.[41] In one of the rooms, officers discovered a room with numerous sexual devices and recording equipment.[42]

Under Buie, the court concluded that the officers were lawfully conducting a protective sweep because the officers "searched the adjoining rooms and did a cursory search of the floor below, where he detained Sadler for a short time."[43] Because there was an arrest, the officers did not need to justify their actions by establishing a concern for their safety when they searched the areas immediately adjoining the place of arrest.[44]

Here, unlike Sadler, there was no arrest before the protective sweep. Thus, the deputies were not permitted to conduct a warrantless search unless

---

[38] Id. at 119-20.

[39] Id. at 120, 126.

[40] Id. at 120.

[41] Id. at 120, 126.

[42] Id. at 120.

[43] Id. at 126.

[44] Id. at 125; see also Hopkins, 113 Wn. App. at 959-60.

they could point to articulable facts that the "area involved in the protective sweep may harbor an individual who poses a danger to those on the scene."[45] As previously discussed, the State fails to point to such facts.

The State poses hypothetical situations to support its assertion that the deputies should be able to search the top floor bedroom. It states,

> What if the deputies could not determine if the defendant was suicidal and they had to release him—with a handgun and assault rifle still in the bedroom. What if the deputies had departed the residence with the defendant and there had been children in the home—with a fully loaded handgun sitting on the bed and an assault rifle behind the door.[46]

But we need not address hypothetical situations unsupported by any evidence in this record. The law is clear that exceptions to the warrant requirement are "'jealously and carefully drawn.'"[47] The State fails to persuade us that we should disregard this admonishment under the facts of this case.

Finally, the State compares the search that occurred in this case to that which occurs when officers take "a mentally unstable person into civil custody pursuant to RCW 71.05.150." It cites a couple of cases regarding warrantless searches associated with civil commitments.[48] Again, there is no support in this

---

[45] Sadler, 147 Wn. App. at 125-26.

[46] Brief of Appellant at 18.

[47] State v. Houser, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980) (quoting Arkansas v. Sanders, 442 U.S. 753, 759, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979)).

[48] Brief of Appellant at 16 (citing State v. Dempsey, 88 Wn. App. 918, 922, 947 P.2d 265 (1997); State v. Lowrimore, 67 Wn. App. 949, 957, 841 P.2d 779 (1992)).

record for applying the law related to civil commitments here. One of the responding deputies characterized Dennis as acting "calm" and "subdued" when he first observed Dennis emerging from a top floor bedroom, and the deputies did not treat this as a civil commitment. For these reasons, reliance on civil commitment cases is misplaced.

Because the deputies did not lawfully enter the bedroom, the State's argument that the deputies lawfully seized the firearms that were in plain view fails.[49] Thus, the trial court correctly concluded that the deputies exceeded the scope of the emergency aid exception when they searched the top floor. The evidence seized must be suppressed.

There does not appear to be any dispute that there was no other evidence to support the charge in this case. Accordingly, termination of the case was proper.

We affirm the order suppressing the evidence and terminating the case.

_____Cox, J._____

WE CONCUR:

_____Trickey, J_____          _____Jau, J_____

---

[49] Id. at 21-22.