IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| IN THE MATTER OF THE PERSONAL RESTRAINT OF: | No. 83195-0-1 |
| HAROLD JOHN MURPHY, Jr., | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

Hazelrigg, A.C.J. — In 2018, Harold Murphy was convicted of a number of felonies which were affirmed on direct appeal by this court. Murphy timely filed this personal restraint petition in which he raises nine claims, including ineffective assistance of trial and appellate counsel, and seeks an order vacating his convictions. Because Murphy fails to demonstrate actual and substantial prejudice as to any and all claims, we deny his petition.

FACTS

Murphy was found guilty of one count each of attempted theft in the first degree and assault in the second degree, both with firearm enhancements,[1] one count of unlawful possession of a firearm in the first degree (UPF1),[2] and three additional counts of attempted theft in the first degree without enhancements.[3] This court affirmed his convictions in an unpublished opinion. State v. Murphy, No. 78231-2-I, slip op. at 1 (Wash. Ct. App. Apr. 13, 2020) (unpublished),

---

[1] Counts 1 and 2.
[2] Count 3.
[3] Counts 4, 5, and 6.

https://www.courts.wa.gov/opinions/pdf/782312.pdf, *review denied*, 196 Wn.2d 1005 (2020). The charges against Murphy arose from a bank fraud scheme targeting Boeing Employees Credit Union (BECU) that involved deposits of fake checks into accounts and withdrawals of provisional funds from those accounts. *Id.* at 1. The relevant facts were set out in Murphy's direct appeal as follows:

> In June 2016, Murphy met Samantha Tinoco and her friend Taya Sneed and recruited them to work for him. Murphy told Sneed he wanted to hire her to promote him as a rapper. Tinoco thought she would be working as a model for Murphy's rap videos. Murphy told the women he would pay them in advance but first they needed to deposit checks in their BECU accounts because his account was "full."
>
> Sneed testified Murphy told her that "they weren't able to get their money, so they put those checks in our name so that we could get it for them, and were also saying that it's going to, like, turn into ours." Tinoco and Sneed also gave Murphy their debit cards and PINs.[4] Murphy claimed he needed the debit cards "because he was doing a show" in Portland, Oregon.
>
> Murphy and a friend showed the women an "envelope full of" checks. The checks were from businesses like Seattle City Light and Aerotek and made payable to Tinoco and Sneed. Murphy drove the women to several BECU branches to deposit the checks and withdraw the cash for him. While in Murphy's car, both Sneed and Tinoco saw a gun in the glove compartment. When Sneed asked about the gun, Murphy said he "only uses it when he needs it."
>
> Between June 10 and 13, Tinoco deposited four checks, immediately withdrew the cash, and gave it to Murphy. Sneed attempted to deposit checks on three occasions. On the third attempt, the teller refused the transaction because too much money had gone through Sneed's account. Later that day, Sneed and Tinoco spoke with a friend who alerted them to the fraudulent scheme. Sneed and Tinoco went to BECU to report the fraud on June 13. By that time, Sneed had deposited and withdrawn almost $5,000 for Murphy. Tinoco had deposited and withdrawn nearly $9,800.
>
> Celeste Barker-Henry testified about her role in a similar incident around the same time. Barker-Henry was experiencing financial troubles and Murphy and his friend told her they could help. They sat in Murphy's car in a parking lot and Murphy offered to write her a check for the money she needed. Barker-Henry gave Murphy

---

[4] Personal identification numbers.

her debit card and PIN. While she was in Murphy's car, Barker-Henry saw a gun in the center console.

The next day on June 15, Murphy gave Barker-Henry a check from Swedish Hospital made payable to her. He told her to deposit the check in her BECU account. Murphy explained that he would withdraw some of the money and leave the amount she needed in her account. When Barker-Henry attempted to deposit the check, the teller informed her the check was "fake." A bank security employee told Barker-Henry to return the next day to discuss the incident. When Barker-Henry left BECU approximately 20 minutes after she entered the bank, Murphy was gone.

Barker-Henry returned to BECU the next day as instructed. The BECU fraud investigator showed her evidence that Murphy had used her debit card to deposit a fraudulent check at an ATM[5] and withdraw cash. A month later, Barker-Henry met with King County Sheriff's Detective Robin Fry and identified Murphy from a photomontage.

Murphy's younger cousin Rolazja Stewart-Satterwhite also testified about her involvement in his scheme. On June 30, Stewart-Satterwhite and her cousin Alysha Stevens[6] met Murphy, who told Stewart-Satterwhite she needed to go into a bank to deposit a check for him. Stewart-Satterwhite refused, but Murphy took a gun from the glove compartment of his car and pressed the barrel into her side. At that point, Stewart-Satterwhite agreed. At Murphy's direction, Stevens then drove Stewart-Satterwhite to a BECU branch in his car.

Initially, Stewart-Satterwhite attempted to deposit the check at the drive-through teller. The teller told them the large amount of the check required deposit inside the bank. Stewart-Satterwhite texted this information to Murphy, who told her to "remain calm" and delete their messages. When Stewart-Satterwhite and Stevens went into the bank, they were escorted into an office to speak with two BECU employees, including financial crime investigator Trichell Avaava. Eventually, Stewart-Satterwhite explained the situation.

Stewart-Satterwhite was worried about returning to Murphy without the cash. In response, Avaava enacted a plan. Avaava wrote Stewart-Satterwhite a false receipt that showed the deposit was pending in her account and would be available after the upcoming July 4 holiday. Stewart-Satterwhite showed the receipt to Murphy and told him that BECU wanted her to go into the branch after July 4 to sign for the large amount of money. Murphy told Stewart-Satterwhite to comply.

On July 7, the day the money was supposed to be available, Stewart-Satterwhite was with Detective Fry and exchanged

---

[5] Automated teller machine.
[6] Stevens and Murphy are not related.

messages with Murphy. When Murphy met Stewart-Satterwhite to pick up his money, officers arrested him.

The State charged Murphy with one count of attempted theft in the first degree and assault in the second degree with firearm enhancements related to the incident involving Stewart-Satterwhite. The State charged him with three additional counts of attempted theft in the first degree stemming from the activities with Tinoco, Sneed, and Barker-Henry. Due to his criminal history, the State also charged Murphy with [UFP1]. A jury convicted Murphy as charged. With an offender score of 10, the court imposed a concurrent high-end standard-range sentence of 170 months of confinement.

*Id.* at 2-5.

On direct appeal, Murphy argued that (1) the trial court erroneously denied his motion to bifurcate or sever the UPF1 count from the other five counts, (2) the prosecutor committed misconduct by improperly commenting on his right to remain silent, (3) his counsel was ineffective for failing to raise various objections, (4) cumulative error deprived him of a fair trial, and (5) sufficient evidence did not support his convictions. We affirmed. *Id.* at 16.

Murphy then timely filed this personal restraint petition (PRP) in which he raised numerous claims, nine of which were referred to the panel by order of this court.[7]

ANALYSIS

I.      Standards for Collateral Relief

"To obtain relief from a PRP based on a constitutional error, a petitioner must show two things: (1) a constitutional error occurred and (2) the error resulted in actual and substantial prejudice." *In re Pers. Restraint of Williams*, 198 Wn.2d

---

[7] Order Dismissing Personal Restraint Petition in Part and Referring Remaining Claims to a Panel of Judges, *In re Pers. Restraint of Murphy*, No. 83195-0-I (Wash. Ct. App. July 10, 2023).

342, 353, 496 P.3d 289 (2021). The petitioner must demonstrate such prejudice by a preponderance of the evidence. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). In other words, the "petitioner has the burden of establishing that, more likely than not, he was actually prejudiced by the claimed error." *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 89, 660 P.2d 263 (1983). "But 'bare allegations unsupported by citation of authority, references to the record, or persuasive reasoning cannot sustain this burden of proof." *In re Pers. Restraint of Pheth*, 20 Wn. App. 2d 326, 332, 502 P.3d 920 (2021) (quoting *State v. Brune*, 45 Wn. App. 354, 363, 725 P.2d 454 (1986)). Actual prejudice is determined "in light of the totality of circumstances." *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985). If the petitioner fails to make this prima facie showing, the "petition will be dismissed." *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810, 792 P.2d 506 (1990).

The standard of review on nonconstitutional claims is different and a "mere showing of prejudice" is insufficient. *Davis*, 152 Wn.2d at 672. Nonconstitutional errors are only considered when "'the claimed error constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Cook*, 114 Wn.2d at 813).

II.      Ineffective Assistance of Counsel

Because Murphy contends that his trial and appellate counsel were both ineffective for failing to raise the various claims he now asserts in this PRP, we set out the ineffective assistance of counsel (IAC) standards here and apply them at the conclusion of each substantive challenge wherein Murphy also alleges IAC.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Pursuant to *Strickland v. Washington*, a successful IAC claim requires the defendant to make two fundamental showings: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "If either element of the test is not satisfied, the inquiry ends." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). If a PRP satisfies the two-part *Strickland* test, the "petitioner has necessarily met the burden of proving 'actual and substantial prejudice'" for collateral relief. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 845, 280 P.3d 1102 (2012).

The first prong of the test requires the defendant to demonstrate that counsel's representation was deficient. *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995). To meet this burden, they must show that counsel's performance "fell below an objective standard of reasonableness based on consideration of all the circumstances." *Id.* at 334-35. We apply "a strong presumption [that] counsel's representation was effective." *Id.* at 335. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *Kyllo*, 166 Wn.2d at 863.

The second prong of the test requires the defendant to show that "counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the

proceeding would have been different." *McFarland*, 127 Wn.2d at 335. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In determining whether the identified errors resulted in such prejudice, we presume, "absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.* at 695.

To prevail on an IAC claim concerning appellate counsel, the petitioner "must demonstrate the merit of any legal issue appellate counsel raised inadequately or failed to raise" and also "demonstrate actual prejudice." *In re Pers. Restraint of Netherton*, 177 Wn.2d 798, 801, 306 P.3d 918 (2013); *In re Pers. Restraint of Lord,* 123 Wn.2d 296, 314, 868 P.2d 835 (1994). "Failure to raise all possible nonfrivolous issues on appeal is not ineffective assistance." *Lord*, 123 Wn.2d at 314. But "if a petitioner can show that [their] appellate counsel failed to raise an issue with underlying merit, then the first prong of the ineffective assistance test is satisfied." *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 787, 100 P.3d 279 (2004). To satisfy the prejudice prong, the petitioner must "show a reasonable probability that, but for [their] counsel's unreasonable failure to file a merits brief, [they] would have prevailed on [their] appeal." *Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).

III.    Invalid Search Warrant

Murphy's first claim is that warrant no. 16-717 violated his constitutional rights under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution because it was overbroad and not

particularized. The State concedes that the search warrant was invalid for lack of particularity,[8] but argues that Murphy is not entitled to relief because he failed to demonstrate actual and substantial prejudice in light of the "overwhelming untainted evidence to prove each charge."

"Both the Fourth Amendment and article I, section 7 require that a search warrant describe with particularity the place to be searched and the persons or things to be seized." *State v. Vance*, 9 Wn. App. 2d 357, 363, 444 P.3d 1214 (2019); *see also State v. Riley*, 121 Wn.2d 22, 28, 846 P.2d 1365 (1993) (warrants must "describe with particularity the things to be seized"). The particularized description of the "things to be seized" must be "in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004). Otherwise, the warrant is invalid on its face and per se unconstitutional. *Id.*

Here, Detective Robin Fry submitted an affidavit for a search warrant in which she identified five cell phones that she believed contained evidence of Murphy's alleged crimes. In support of a finding of probable cause, the affidavit included a detailed narrative that there was "evidence of those crimes" on the identified cell phones. However, the search warrant that was ultimately issued made no particularized reference as to which cell phones were to be searched. Although courts "may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and the supporting document accompanies the warrant," *Id.* at 557-58, the affidavit here

---

[8] Because the State correctly concedes the warrant was constitutionally invalid for lack of particularity, we do not consider Murphy's additional argument that the warrant was also overbroad.

did not accompany the warrant. Accordingly, the State's concession is correct; the warrant was facially invalid.

A.    Actual and Substantial Prejudice

On direct appeal, "if trial error is of constitutional magnitude, prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt." *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). To determine whether the error was harmless, this court applies the "'overwhelming untainted evidence test.'" *State v. Elwell*, 199 Wn.2d 256, 270, 505 P.3d 101 (2022) (internal quotation marks omitted) (quoting *State v. Thompson*, 151 Wn.2d 793, 808, 92 P.3d 228 (2004)). Generally, under that test, it is the State's burden to show beyond a reasonable doubt that the untainted evidence admitted at trial was "'so overwhelming that it necessarily leads to a finding of guilt.'" *Id.* (quoting *Thompson*, 151 Wn.2d at 808). However, on collateral review, "we shift the burden to the petitioner to establish that the error was not harmless; in other words, to establish that the error was prejudicial." *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 826, 650 P.2d 1103 (1982). Thus, Murphy must show by a preponderance of the evidence that he was actually and substantially prejudiced by the warrantless search. *See Davis*, 152 Wn.2d at 671-72.

Murphy points to the following evidence that was retrieved from his phone: the photo of a Makarov handgun next to Barker-Henry's debit card, text messages between himself and his friend, Zaheed Lynch, and between himself and Aviel Marie, the registered owner of the Dodge Challenger. In his opening brief,

Murphy's entire argument on the prejudice aspect of this assignment of error is constrained to two paragraphs in which he identifies Stewart-Satterwhite's testimony that the gun in the photograph was similar to the one Murphy had pointed at her and asserts that the State's arguments at trial were based on the text messages from the phone. According to Murphy, his cell phone "contained a trove of prejudicial information" that was used against him at trial and all of that evidence was "extremely prejudicial." However, Murphy offers only one sentence from the State's closing argument in which it quoted a text from Murphy's phone and stated, "[f]ind a bitch with a BECU account and we can hit it for $15K," and does not specify which counts were impacted or otherwise provide argument as to the nature of the asserted prejudice. Such allegations without "citation of authority, references to the record, or persuasive reasoning" are insufficient to meet his burden of proving actual and substantial prejudice. *Pheth*, 20 Wn. App. 2d at 332. Accordingly, Murphy is not entitled to collateral relief on this basis.

B.    IAC Stemming from Invalid Search Warrant

The State asserts that "a timely motion to suppress the evidence found only on Murphy's phones would likely have been granted" and concedes that "trial counsel's failure to challenge the cell phone search warrant was deficient."[9] We agree. However, Murphy must also establish prejudice under the *Strickland* standard in order to obtain relief. *Crace*, 174 Wn.2d at 845. To do so, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

---

[9] We accept this concession as the warrant was unconstitutional on its face.

U.S. at 694. Under this framework, the issue is whether Murphy has shown that the evidence obtained as a result of the invalid search warrant is "sufficient to undermine confidence in the outcome." *Id.*

In his opening petition, Murphy provides no prejudice argument under the *Strickland* standard regarding the evidence obtained through the defective warrant; he merely states that his trial counsel "failed to file a suppression motion based upon the defective search warrant" (a fact conceded by the State) and "trial counsel's failure to raise a suppression motion was ineffective" (a legal conclusion without supporting analysis).[10] In his reply brief, Murphy dedicates substantial argument as to the State's reliance on the cell phone evidence and its "prejudicial" effect on the proceeding under *Strickland*. But this argument "raised for the first time in a reply brief is too late for consideration." *State v. Pervez*, 15 Wn. App. 2d 265, 272 n.11, 478 P.3d 103 (2020). Accordingly, we decline to reach the merits

---

[10] Murphy also opines that the State committed a violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), because it had actual knowledge of the defects in the warrant and thus had an obligation to disclose those defects to Murphy's trial counsel, who "would have [then] filed a suppression motion."

To establish a *Brady* violation, Murphy has the burden to demonstrate the three following elements: "[(1)] The evidence at issue must be favorable to the accused either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). As our Supreme Court has explained, "if the means of obtaining the exculpatory evidence has been provided to the defense, the *Brady* claim fails." *State v. Mullen*, 171 Wn.2d 881, 896, 259 P.3d 158 (2011) (quoting *United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985).

Murphy does not contend that the State failed to disclose either the facially invalid warrant or the affidavit upon which it was based. As Murphy had access to both and failed to file a suppression motion, this does show that his trial counsel performed deficiently, but it does not show that the State committed a violation of *Brady*. Even assuming arguendo that the State was obligated to disclose its opinions and conclusions as to the validity of the warrant, i.e., its work product under CrR 4.7(f)(1), Murphy's claim would still fail as he does not show prejudice.

of Murphy's IAC claim as it relates to the alleged prejudice resulting from the invalid warrant.[11]

IV.    Sufficiency of Evidence in Counts 4, 5, and 6

Murphy argues that counts 4, 5, and 6 should be vacated on sufficiency grounds because none of the individual transactions relied upon for those counts exceeded the $5,000 threshold under the theft statute and the jury was not instructed to aggregate the amounts.

When a conviction is based on insufficient evidence, it violates "the due process clause of the Fourteenth Amendment and thus results in unlawful restraint." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Spruell*, 57 Wn. App. 383, 385, 788 P.2d 21 (1990). "[Q]uestions of credibility, persuasiveness, and conflicting testimony must be left to the jury." *Martinez*, 171 Wn.2d at 364.

In counts 4, 5, and 6, the State charged Murphy with attempted theft in the first degree pursuant to RCW 9A.56.030(1)(a). The jury was instructed that theft

---

[11] It is noteworthy that in Murphy's direct appeal, we rejected his sufficiency claims without mentioning any of the evidence obtained through the warrantless cell phone search. *See Murphy*, slip op. at 14.

in the first degree requires "theft of property exceeding $5,000 in value."[12] "Theft" was defined as follows: "to wrongfully obtain the property of another, with intent to deprive that person of such property, or by color or aid of deception, to obtain control over the property of another, with intent to deprive that person of such property."[13] Further, the instructions provided that "[w]henever any series of transactions that constitutes theft is part of a common scheme or plan, then the sum of the value of all transactions shall be the value considered in determining the degree of theft involved." The language of the to-convict instructions[14] required the State to prove beyond a reasonable doubt that, with the intent to commit theft in the first degree, Murphy did an act that constituted a substantial step[15] toward the commission of that crime.

Murphy asserts "there was no evidence of a substantial step towards the commission of or intent to commit theft of over $5,000."

A.      Count 4—BECU and Barker-Henry

Barker-Henry recalled planning to meet up with Murphy at the BECU in Tukwila on June 15, 2016. That day, they met at a Starbucks in the area before Murphy drove her to BECU. Barker-Henry explained that Murphy told her to walk into the BECU and deposit a check for $2691.34 into her account. Murphy gave her the check, made out to her name, and she walked into the BECU branch,

---

[12] This language aligns with the statutory definition provided in RCW 9A.56.030(1)(a). The jury was also instructed that "value" means "the market value of the property at the time and in the approximate area of the act."

[13] This follows the statutory definition under RCW 9A.56.020(1).

[14] "Criminal attempt" is defined under RCW 9A.28.020(1) and matches the jury instruction provided here.

[15] A "substantial step" was defined as "conduct that strongly indicates a criminal purpose and that is more than mere preparation."

handed the check to the bank teller, and asked to deposit the check. When the teller realized the check was fake, Barker-Henry briefly conversed with BECU security and Tukwila police before leaving the bank. She also confirmed through security camera photographs, taken from the ATM on that same day at around the same time, that Murphy had attempted to use her ATM card to deposit another check for $2,579.61 in her name into her BECU account. A financial crime investigator for BECU, Trichell Avaava, also testified to the aforementioned deposits and confirmed the location and amount of both. Based on those two attempted transactions, Avaava assessed BECU's total exposure to be $5,270.95.

B.      Count 5—BECU and Sneed

Sneed testified that she had a conversation with Murphy in which he requested her full name, address, and phone number. The following day, Murphy drove Sneed and Tinoco to Federal Way and went into some apartments where he picked up an envelope full of checks. Sneed explained that "[a] lot" of those checks had her name on them. Others were in Tinoco's name. Sneed stated that she and Tinoco were instructed to go into different banks and cash the checks, which they did. Tinoco recalled depositing one check for $2,674.30 into an ATM and another for $2,370.85 inside of a bank. Avaava verified the amount of the first transaction, which was made at a BECU ATM, and the second, which was made at the BECU Everett branch. Avaava's assessment was that the total exposure to BECU was $5,065.15.

C.      Count 6—BECU and Tinoco

Tinoco testified that Murphy asked for her identification and told her she would get $6,000 in advance for modeling work. Murphy and "Marcus"[16] explained to Tinoco that "they would just give [her] checks, and they would just give [her] it in cash." They also told Tinoco that they needed her to deposit and cash the checks because "their accounts were full." Tinoco recalled going to Murphy's dad's house in Federal Way with Sneed, Murphy, and Marcus. She stated that Murphy and Marcus told her and Sneed to stay in the car while they went into an apartment, and when they came back to the car, Murphy and Marcus showed them two checks that were made out to Tinoco and Sneed. Tinoco recalled obtaining about $9,000 or $10,000 from cashing checks in her BECU account. While she "believed it was two" checks that made up the total amount, the State introduced copies of four checks made out to and signed by Tinoco. The checks were for $2,388.64, $2,480.56, $2,587.61, and $2,351.84. Avaava verified that all four checks were used in transactions with BECU and the total loss or exposure to BECU was $9,808.65.

Viewed in the light most favorable to the State, the evidence shows that Murphy made multiple substantial steps towards theft in the first degree as to each of these separate victims. Though the transactions were not all successful, a reasonable juror could conclude that Murphy had the intent to steal an amount over $5,000 when he obtained the women's personal information, procured fraudulent checks in their names, provided those checks to the women, drove them

---

[16] "Marcus" is an associate of Murphy who did not testify.

to various BECU locations, and directed them to deposit and cash the checks. Moreover, the value of the checks underlying each count exceeded the $5,000 statutory threshold. Based on this evidence, a rational trier of fact could have concluded that Murphy was guilty beyond a reasonable doubt and thus, his claim of insufficiency fails as to these three counts.

V.     To-Convict Instructions for Counts 1, 4, 5, and 6

Murphy next argues that the to-convict instructions for counts 1, 4, 5, and 6 violated his rights to jury unanimity, due process of law, and notice of the charge. We disagree.

A.     Omission of the Victims' Names

Murphy asserts that the failure to name each of the victims in the to-convict instructions for counts 1, 4, 5, and 6 violated his constitutional rights to notice of the charge and juror unanimity.

"Accused persons have the constitutional right to know the charges against them." *State v. Pry*, 194 Wn.2d 745, 751, 452 P.3d 536 (2019); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The State provides notice of charges by the filing of an information, which must set "forth every essential statutory and nonstatutory element of the crime." *Id.* An element is essential if it "'is one whose specification is necessary to establish the very illegality of the behavior.'" *Id.* at 752 (quoting *State v. Johnson*, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992)). "[I]n cases of theft and larceny proof of ownership of the stolen property in the specific person alleged is not essential," and thus, the victim's name is "not a necessary

- 16 -

element of a theft instruction." *State v. Lee*, 128 Wn.2d 151, 159, 904 P.2d 1143 (1995). However, "allegations of ownership must be sufficiently stated in an information to establish that the property was not that of the accused." *Id.*

While the to-convict instructions for attempted theft in the first degree as charged in counts 1, 4, 5, and 6 did not specify the alleged victims, the second amended information did. As the charging document sufficiently stated that the property at issue was not Murphy's, the State provided proper notice of the charges.

Murphy also argues that the jury could have based the convictions on government entities not named in the charging document because no instruction was given about the "allocation of loss between BECU, the four women, and the entities whose checks were forged." Because government entities cannot be victims of theft under RCW 9A.56.020, Murphy avers that the evidence was insufficient to support these counts. His argument is unpersuasive.

When the parties discussed the to-convict instructions for attempted theft in the first degree prior to closing arguments, defense counsel objected to the State's proposed instructions based on the failure to specifically name the alleged victims. The State, which proposed WPIC 100.02,[17] assured that it would "be making very

---

[17] WPIC 100.02 provides the following:

To convict the defendant of the crime of attempted (fill in crime), each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about (date), the defendant did an act that was a substantial step toward the commission of (fill in crime);
(2) That the act was done with the intent to commit (fill in crime); and

- 17 -

clear elections during closing with respect to [c]ounts 1, 4, 5, and 6, and which checks and which young woman's actions those are corresponding to."  The trial court accepted the State's proposed instructions.

During closing arguments, the State explained to the jury that "under each of these counts, you are given the responsibility of gathering together, of summing up the value of the transactions under each of the accounts," which is "why we've separated these counts by the woman involved and the bank account involved." For each count of attempted theft, the State specified the victim whose BECU account was used along with the fraudulent checks relied upon.  Because the State made clear elections by expressly naming the alleged victims for each count and Murphy provides no support for his contention that the jury would have disregarded those elections and based the convictions on government entities as the victims, his argument fails.

Murphy next argues that the lack of named victims in the instructions violated his right to a unanimous jury verdict under *State v. Stephens*, 93 Wn.2d 186, 190-91, 607 P.2d 304 (1980).  He is mistaken.  Stephens was "charged with one count of assault against two victims conjunctively," i.e., the instruction provided that the "jury must find 'the defendant knowingly assaulted Richard Heieck *or*

_____

(3)  That the act occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 100.02, at 492 (5th Ed. 2021).

Norman Jahnke." *Id.* at 189. That instruction was erroneous as it "allowed conviction if, *e.g.*, six jurors believed Stephens assaulted Jahnke and six believed he assaulted Heieck." *Id.* at 190. The court explained that "[t]he instruction, in effect, split the action into two separate crimes . . . while the information charged only one." *Id.* Accordingly, the court held that this instruction violated Stephens' right to a unanimous jury verdict. *Id.* at 190-91. Here, however, the instructions did no such thing; the acts alleged by the State were not set out in the conjunctive and none of the instructions split any one action into more than one crime. Rather, the instructions remained in line with the second amended information and, at closing argument, the State clearly identified which victim's BECU account was at issue in each separate count.

Notably, Murphy's argument that the to-convict instructions were required to name the alleged victims is directly contradicted by *State v. Lee*, 128 Wn.2d at 159.[18] There, the State charged Lee with theft in the second degree and though the information included the names of the victims, the to-convict instructions did not. *Id.* at 154. On appeal, Lee argued that the trial court erred by not instructing the jury to unanimously agree on the identity of the theft victim. *Id.* at 156. Our Supreme Court disagreed and explained that the name of the person whose property was stolen is not an element of the crime and thus the instructions are not required to name the victim. *Id.* at 158-59. In theft and larceny cases, "[t]he State

---

[18] Murphy considers this portion of *Lee* to be nonbinding dicta because the court ultimately reversed Lee's conviction on sufficiency grounds. However, as the State notes, the discussion of the unanimity issue in *Lee* is persuasive and directly on point here. *See also, State v. Greathouse,* 113 Wn. App. 889, 902, 56 P.3d 569 (2002) ("*Lee* does not stand for the proposition that an information that fails to state the name of the owner of the stolen property is constitutionally deficient.").

is required to prove only that [the property] belonged to someone other than the accused." *Id.* at 159. Accordingly, the court held "there was no error in failing to include the names of the victims in the 'to convict' instruction" and "no unanimity instruction regarding the victim's identity was needed." *Id.* at 158, 160. The same is true here.[19]

Murphy also claims that his right to a unanimous verdict was violated because the State did not elect the underlying acts it relied on to demonstrate a "substantial step" and the court did not provide an instruction pursuant to *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984). "Washington requires unanimous jury verdicts in criminal cases." *Stephens*, 93 Wn.2d at 190. "[A] defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." *Petrich*, 101 Wn.2d at 569. Thus, "[w]hen the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act." *State v. Kitchen*, 110 Wn.2d 403, 409, 607 P.2d 304 (1980). However, neither an election nor unanimity instruction is required when the counts are based on "a continuing course of conduct." *Petrich*, 101 Wn.2d at 571. "To determine whether criminal conduct constitutes one continuing act, the facts must be evaluated in a commonsense manner." *State v. Handran*, 113 Wn.2d 11, 17,

[19] Murphy urges this court to disregard *Lee*'s discussion of the jury instruction issues because, he contends, it is at odds with two subsequent Supreme Court decisions, *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Both cases are inapposite and neither requires the to-convict instructions for theft to name the victims. Thus, we follow the reasoning set out in *Lee*.

775 P.2d 453 (1989). "Where evidence involves conduct at different times and places, or different victims, then the evidence tends to show several distinct acts." *State v. Love*, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). Conversely, evidence of "an ongoing enterprise with a single objective" shows a continuing course of conduct. *Id.* at 361.

Here, for each count of attempted theft in the first degree, the jury was instructed that, in order to convict Murphy, it must find that during the specified time period "the defendant did an act that was a substantial step toward the commission of Theft in the First Degree." In closing argument, the State pointed to the evidence of numerous actions by Murphy, all of which targeted BECU through different "recruits." These acts included recruiting the women, obtaining their personal information, providing them with fraudulent checks, driving them to the banks and ATMs, and explaining specifically how to conduct themselves when questions were asked. His conduct toward Stewart-Satterwhite took place between June 30 and July 7, 2016, that involving Barker-Henry on June 15, and as to both Sneed and Tinoco between June 10 and 13. Although each count related to a different person's bank account, they all concerned the same banking institution, BECU. Moreover, while some of the steps were taken on different dates, they were all carried out within a brief period of time with largely synchronous orchestration. Looking at the evidence in a common-sense manner, these counts all involved a continuing course of conduct with a single objective: taking funds from BECU with fraudulent checks by targeting multiple women.

Accordingly, counts 1, 4, 5, and 6 all constituted a continuing course of conduct and no unanimity instruction nor election was necessary.[20]

VI.     Failure To Instruct on Common Scheme or Plan for Counts 4, 5, and 6

Murphy contends that counts 4, 5, and 6 must be vacated because the State aggregated the fraudulent transactions in order to meet the $5,000 threshold for theft in the first degree but the jury was not instructed on common scheme or plan. The State argues that if the instruction was required, Murphy invited the error as his proposed to-convict instructions were identical to those given to the jury.

Pursuant to RCW 9A.56.010(21)(c), "the State can aggregate a series of transactions that constitute theft in one count and use the aggregate value of the transactions in determining the degree of theft." *State v. Hassan*, 184 Wn. App. 140, 146, 336 P.3d 99 (2014). Such aggregation is only allowed "if the State can show that the transactions are part of a criminal episode or a common scheme or plan." *Id.* If the State does aggregate the value, "a common scheme or plan is an essential element of a crime that must be included in the information and in the to-convict instruction." *Id.*

Here, the second amended information alleged that Murphy committed attempted theft in the first degree as a "series of transactions which were part of a criminal episode, continuing criminal impulse, and a common scheme or plan in which the sum value of the property or services did exceed $5,000." Neither the

---

[20] Murphy also argues that trial and appellate counsels' respective failure to raise these issues at trial and on direct appeal constitutes ineffective assistance of counsel. However, as Murphy fails to show any error stemming from these issues, let alone resulting prejudice, his claims of ineffective assistance of counsel on this basis fail.

State's nor Murphy's proposed to-convict instructions included the common scheme or plan element. Ultimately, the to-convict instructions did not require the jury to determine whether there was a common scheme or plan.

"When a defendant proposes an instruction that is identical to the instruction the trial court gives, the invited error doctrine bars an appellate court from reversing the conviction because of an error in that jury instruction." *State v. Summers*, 107 Wn. App. 373, 381, 28 P.3d 780 (2001), *modified on recons. on other grounds*, 43 P.3d 526 (2002). The invited error doctrine applies in "every situation where the defendant's actions at least in part cause the error." *Id.* at 381-82. As our Supreme Court has noted, "There can be no doubt that this is a strict rule, but we have rejected the opportunity to adopt a more flexible approach." *State v. Studd*, 137 Wn.2d 533, 547, 973 P.2d 1049 (1999). Even when the instruction is unconstitutional and relieves the State of its burden to prove an essential element beyond a reasonable doubt, the invited error doctrine applies. *Id.* at 546-47. Because Murphy's failure to both propose alternate instructions and to object to those given, contributed to the error, the invited error doctrine bars relief on this challenge.

A. Failure To Challenge Instructions as IAC

Murphy submits that his trial counsel and appellate counsel were both ineffective for failing to raise this issue in both levels of proceedings. "If instructional error is the result of ineffective assistance of counsel, the invited error doctrine does not preclude review." *Kyllo*, 166 Wn.2d at 861.

1.    Trial Counsel

Murphy states that trial counsel "did not propose or object to the failure to give proper instructions." Even assuming arguendo that trial counsel was deficient for failing to propose the common scheme or plan instruction with the to-convict instructions in order to allow the State to aggregate the amounts of the transactions at issue for counts 4, 5, and 6, Murphy does not demonstrate that this resulted in prejudice under the *Strickland* standard. Had Murphy's trial counsel proposed the instruction it would have been provided to the jury. However, even assuming it had been, the evidence was overwhelming to show a common scheme or plan and to support the value of the transactions in each count. It is also unclear what strategic or tactical reason counsel could have to propose an instruction which would *assist* the State in proving the $5,000 threshold, which strongly suggests that both the decision not to object and to refrain from proposing an aggregation instruction were tactical defense choices. Accordingly, Murphy fails to show that there was a reasonable probability that but for trial counsel's failure to propose the instruction, the outcome of the proceeding would have been different as to these counts.

2.    Appellate Counsel

Murphy also claims his appellate counsel was ineffective based on the failure to raise this issue in his direct appeal. Assuming counsel had assigned error on this issue and satisfied RAP 2.5, Murphy shows no reasonable probability that the outcome would have been different. Murphy's complete lack of argument

as to prejudice on this issue seems to demonstrate that he believes this would have required automatic reversal, but he would be mistaken.

"Where a to-convict instruction omits an essential element of a crime, it is constitutionally defective unless the State can demonstrate that the omission was harmless beyond a reasonable doubt." *Hassan*, 184 Wn. App. at 149. For the error to have been harmless on direct appeal, this court would have needed to "'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting *Neder v. United States*, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). Murphy fails to establish that the verdict would not have been the same, which is his burden at this stage. As the evidence of a common scheme or plan and the value of the property involved in the attempted theft was overwhelming and Murphy's argument as to prejudice is inadequate, he has not shown a reasonable probability that the outcome on direct appeal would have been any different.

VII.    Separate Convictions for Counts 1 and 2

Murphy contends that he was convicted and punished twice for the same act in counts 1 and 2, in violation of the constitutional prohibition against double jeopardy, and argues that those counts "should have merged or counted as the same criminal conduct."[21] We disagree.

---

[21] While Murphy asserts that "the two offenses were the same criminal conduct," he provides insufficient analysis to warrant consideration of that distinct legal issue. He offers one citation to RCW 9.94A.589(1)(a), which provides the definition of same criminal conduct, but no accompanying argument as to how these offenses satisfy the statutory definition. "This court will

A.     Double Jeopardy

"The double jeopardy clause of the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution prohibit the imposition of multiple punishments for the same offense." *State v. Tili*, 139 Wn.2d 107, 112, 985 P.2d 365 (1999). "Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). When the statutes do not expressly disclose whether the legislature intended to authorize separate punishments, we "apply a rule of statutory construction that has been variously termed the 'same elements' test, the 'same evidence' test, and the *Blockburger* test." *Orange*, 152 Wn.2d at 816 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

Under the *Blockburger* test, "double jeopardy principles are violated if the defendant is convicted of offenses that are identical in fact and in law." *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 537, 167 P.3d 1106 (2007). "If each offense contains an element not contained in the other, the offenses are not the same; if each offense requires proof of a fact that the other does not, the court presumes the offenses are not the same." *Id.* When one of the crimes is an attempt crime, which requires the element of a "substantial step," the test is slightly modified because in order to determine "whether each offense requires proof of a fact that the other does not, the 'abstract' term 'substantial step' must be given a factual

---

not consider claims insufficiently argued by the parties." *State v. Elliott*, 114 Wn.2d 6, 15, 785 P.2d 440 (1990). Because Murphy offers no argument here, we do not reach the merits.

- 26 -

definition." *Id.* (quoting *Orange,* 152 Wn.2d at 818). That definition depends on the "actual facts constituting the 'substantial step.'" *Id.* If the evidence is such that various acts could have been the "substantial step," we do not assume that the jury relied on the one act that also proves the other crime. *Id.* at 538. For example, in *State v. Esparza*, this court determined there was no double jeopardy violation because the assault at issue "did not necessarily constitute the substantial step taken in furtherance of the robbery." 135 Wn. App. 54, 63, 143 P.3d 612 (2006). As "there was other conduct proved at trial that did not constitute assault that would be sufficient to establish that [the accused] took a substantial step toward the commission of first degree robbery" and "it was not *required* for the State to prove facts sufficient to convict [the defendant] of second degree assault in order for it to prove [the defendant] committed the offense of first degree attempted robbery," there was no double jeopardy violation. *Id.* at 64.

Here, because the statutes for assault in the second degree, RCW 9A.36.021, and attempted theft in the first degree, RCW 9A.28.020 and 9A.56.030, do not provide express legislative intent for cumulative punishments, we apply the *Blockburger* test to determine whether the crimes are identical in fact and law. *See Borrero*, 161 Wn.2d at 537. Murphy asserts that one act, pointing a gun at Stewart-Satterwhite, was relied upon for both the assault in the second degree in count 2 and the "substantial step" towards attempted theft in the first degree in count 1.

However, during closing argument, the State pointed to numerous acts that the jury could rely on for Murphy's substantial step in count 1:

> On June 30th, he drove to the hospital—to the hospital parking lot to
> pick up [Stewart-Satterwhite] and [Stevens]. That was a substantial

- 27 -

step, that was conduct. He tried to convince [Stewart-Satterwhite] to deposit the check when the other part of the plan fell apart. He pointed a gun at her to force her to deposit the check, instructing [Stevens] to drive to the bank, providing a car, and providing [Stewart-Satterwhite] with a cover story about what to say, that this was a settlement from a car accident, and then waiting through July 1st, 2nd, 3rd, 4th, 5th, and 6th. There's some action in that waiting, keeping in communication with [Stewart-Satterwhite], making sure the plan was in place, and then going to the site, going to the location, the Days Inn, on the 7th is another substantial step to pick up the money.

Although the State told the jury that it could rely on the fact that Murphy pointed a gun at Stewart-Satterwhite, that was certainly not the only act for which the State presented evidence at trial. Because there was other conduct on which the jury could rely that constituted a substantial step towards theft in the first degree and it was not *necessary* for the State to prove that Murphy pointed a firearm at Stewart-Satterwhite in order to prove the attempted theft count, these convictions do not violate double jeopardy. *Esparza*, 135 Wn. App. at 63-64; *Borrero*, 161 Wn.2d at 537-38.

B.    Merger

Murphy next avers that counts 1 and 2 should have merged. Generally, when "proof of one crime depends upon proof of another, the crimes will merge." *State v. Grant*, 172 Wn. App. 496, 500, 301 P.3d 459 (2012). However, the merger doctrine "only applies where the Legislature has clearly indicated that in order to prove a particular degree of crime (*e.g.,* first degree rape) the State must prove not only that a defendant committed that crime (*e.g.,* rape) but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal

statutes (*e.g.,* assault or kidnapping)." *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983).

Because Murphy's conviction for attempted theft was not raised to the first degree through the conduct that constituted assault against Stewart-Satterwhite, but instead on the value of the property he attempted to steal pursuant to RCW 9A.56.030(1)(a), the merger doctrine is inapplicable.[22]

## VIII.   All Four Counts of Attempted Theft as Same Criminal Conduct

Murphy next avers that the four counts of attempted theft (counts 1, 4, 5, and 6) should be treated as one for sentencing purposes because, he contends, they are based on the same criminal conduct.  The State insists that Murphy has waived this challenge.  In his reply brief, Murphy responds to the State's waiver argument by noting that he "has raised ineffective assistance of counsel at sentencing and on appeal so the issue can be considered through that rubric."

Same criminal conduct is defined in RCW 9.94A.589(1)(a), as follows:

> Except as provided in (b), (c), or (d) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. Sentences imposed under this subsection shall be served concurrently. Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.535. "Same criminal conduct," as used in this subsection, means two or more crimes that require the same

---

[22] Murphy asserts that the double jeopardy and merger arguments regarding counts 1 and 2 "should have been raised at trial or on appeal" and "failure to do so was ineffective."  However, as established, each of those constitutional challenges are without merit, and thus, Murphy necessarily fails to show ineffective assistance of counsel on these bases.

criminal intent, are committed at the same time and place, and involve the same victim.

"In order for separate offenses to 'encompass the same criminal conduct' under the statute, three elements must therefore be present: (1) same criminal intent, (2) same time and place, and (3) same victim." *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). The absence of any element prohibits a finding of same criminal conduct. *Id.* Here, a finding of same criminal conduct is plainly precluded as each count concerned a different victim: count 1—Stewart-Satterwhite; count 2—Barker-Henry; count 3—Sneed; and count 4—Tinoco. Accordingly, Murphy's claim fails.[23]

IX.    Additional Bases for IAC of Trial Counsel

Murphy raises two additional grounds on which he asserts his trial and sentencing were impacted by IAC. First, Murphy contends that trial counsel was ineffective for failing to object to "very prejudicial evidence." "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). "The decision of when or whether to object is a classic example of trial tactics" and it is a legitimate trial tactic for counsel to forgo an objection when seeking to "avoid highlighting certain evidence." *Id.; State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). When a claim of IAC is

---

[23] As Murphy does not establish any error, much less prejudice, he is unable to demonstrate deficient performance as to this same criminal conduct claim. Accordingly, his arguments that trial counsel was ineffective for not presenting a same criminal conduct argument at sentencing, and that appellate counsel was ineffective for not raising this issue in his direct appeal necessarily fail.

based on counsel's failure to object, "the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct; (2) that an objection to the evidence would likely have been sustained; and (3) that the result of the trial would have been different had the evidence not been admitted." *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998) (internal citations omitted).

Instead of attempting to satisfy those requirements, Murphy merely identifies testimony and asserts, without analysis, that it should have been excluded under ER 403 and 404. He then concludes that "[i]t was ineffective not to object" and declares the "prejudice is apparent." Such conclusory statements, unsupported by authority and persuasive reasoning, are insufficient to satisfy his burden. *See Pheth*, 20 Wn. App. 2d at 332. Under *Strickland*, it is Murphy's burden to demonstrate both deficient performance and resulting prejudice and he fails to show either here.

Second, Murphy avers his trial counsel was ineffective for failing to propose WPIC 6.05. WPIC 6.05 concerns accomplice testimony and it provides the following:

> Testimony of an accomplice, given on behalf of the [State] [City] [County], should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 203 (5th Ed. 2021). This "cautionary instruction is required only if the accomplice testimony is uncorroborated." *State v. Willoughby*, 29 Wn. App. 828, 831, 630

P.2d 1387 (1981). However, "where the accomplice testimony is corroborated by independent evidence, failure to give the instruction may not be error." *State v. Harris*, 102 Wn.2d 148, 153, 685 P.2d 584 (1984), *overruled in part on other grounds by State v. McKinsey*, 116 Wn.2d 911, 810 P.2d 907 (1991). "If the accomplice testimony was substantially corroborated by testimonial, documentary or circumstantial evidence, the trial court did not commit reversible error by failing to give the instruction." *Id.* at 155.

Murphy asserts that the instruction was mandatory in this case due to the "lack of any corroboration" of Stewart-Satterwhite's allegations that Murphy pointed a gun at her. While Stewart-Satterwhite's testimony was the basis of count 2, assault in the second degree with a deadly weapon, she was the victim of that assault. Pursuant to RCW 9A.08.020(5), "a person is not an accomplice in a crime committed by another person if: (a) [They are] a victim of that crime." Thus, Stewart-Satterwhite's testimony concerning the assault in which she described Murphy pointing a gun at her does not implicate WPIC 6.05. But, even if Murphy could satisfy the deficient performance prong of the test on the failure to propose this instruction, which he does not, he still fails to demonstrate that it produced a reasonable likelihood of prejudice as to the count he identifies. Murphy then broadly asserts that the collective impact of "all errors" shows a reasonable probability of prejudice under *Strickland*. He is incorrect.[24]

---

[24] Murphy does not raise any additional bases for his claim of IAC by appellate counsel apart from those already addressed. Although the State concedes that "Murphy's direct appeal was devoid of merit and poorly presented," it asserts that Murphy has failed to show prejudice under *Strickland*. In accordance with our previous analysis, we agree with the State.

X.     Community Custody on Count 2

Finally, Murphy claims the trial court imposed a sentence that exceeded the statutory maximum for count 2, assault in the second degree, and requests an order directing the trial court to strike the term of community custody.  The State concedes the error and we agree.

Assault in the second degree is a class B felony with a maximum sentence "by confinement in a state correctional institution for a term of ten years."  RCW 9A.36.021(2)(a); 9A.20.021(1)(b).  Pursuant to RCW 9.94A.701(10), the term of community custody "shall be reduced by the court whenever an offender's standard range term of confinement in combination with the term of community custody exceeds the statutory maximum for the crime as provided in RCW 9A.20.021."

Murphy's offender score on count 2, which provided a maximum term of 120 months, was 11 and his standard range was 63 to 84 months in prison.  On count 2, the court imposed 84 months of confinement to run consecutively with the mandatory firearm enhancement of 36 months for a total of 120 months of confinement.  Because the court also imposed a term of community custody of "at least 4 months, plus all accrued earned early release time at the time of release," the sentence on count 2 exceeds the statutory maximum.  Accordingly, the trial court must strike the community custody term from the judgment and sentence.

Because Murphy fails to show actual and substantial prejudice resulting from any of his claims, including those alleging ineffective assistance of trial and

appellate counsel, his petition is denied.  However, we remand for the trial court to correct the judgment and sentence.

Hazelrigg, A.C.J.

WE CONCUR:

Smith, C.J.