# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58526-0-II |
| Respondent, | |
| v. | |
| HECTOR CODY ORTIZ, III, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Hector C. Ortiz, III, appeals his convictions for second degree attempted murder and first degree unlawful possession of a firearm. Ortiz argues that the trial court should have suppressed the firearm found when he was arrested because the Department of Corrections (DOC) arrest warrant used to arrest him was pretextual and unsupported by reasonable cause. Ortiz also argues the trial court erred by making a credibility determination based on an erroneous presumption that testifying law enforcement officers are credible. In a statement of additional grounds for review (SAG),[1] Ortiz makes additional arguments regarding the trial court's denial of his motion to suppress.

Even if we assume without deciding that the DOC arrest warrant was pretextual, any error was harmless. As to the challenge that the trial court erred when it made a credibility determination by applying an erroneous presumption, the record shows that when the trial court's ruling is read in context, the trial court did not make a credibility determination based on an erroneous

---

[1] RAP 10.10.

presumption and, therefore, did not err. We also reject Ortiz's SAG claims. Accordingly, we affirm Ortiz's convictions.

FACTS

A.    COMMUNITY CUSTODY AND DOC ARREST WARRANT

1.    Background Information

In May 2017, Ortiz pleaded guilty to one count of first degree robbery and was sentenced to 46 months of confinement and 18 months of community custody. In October 2019, Ortiz was released into community custody. One of Ortiz's terms of community custody required him to "report and be available for contact with the assigned [community corrections officers (CCO)] as directed."[2] Clerk's Paper (CP) at 308.

On July 6, 2020, police responded to a report of shots fired and found Milton White with blood on his face and clothing. Mark Houlihan was also on the scene. Neither man identified the shooter. Later that day, an anonymous source informed police that someone told them Ortiz was the shooter.

On July 9, Ortiz was assigned a new CCO, Erika Toth. On July 15, Detective Bill Foster informed CCO Toth that Ortiz was "the suspect in a shooting that happened [in July 2020]." CP at 56. Detective Foster asked CCO Toth whether she knew what kind of car Ortiz drove, and Toth said she would try to find out when Ortiz reported in.

On July 16, Ortiz called the DOC and was told he needed to report in person. Ortiz told the DOC employee he had COVID symptoms and would be tested the following day. Because

---

[2] Ortiz's conviction for a "serious violent offense" also required that he "report to and be available for contact with the assigned [CCO] as directed." CP at 301.

Ortiz had been identified as a suspect in the July 6 shooting, the DOC employee instructed Ortiz to report to the office by 3:00 PM that day. When Ortiz reported in person later that day, the DOC employee did not administer an oral swab drug test because of Ortiz's COVID symptoms. Ortiz was told to contact CCO Toth the following Monday and provide documentation of his COVID testing appointment. Ortiz was also told his next report date would be August 19.

On July 20, Ortiz reported in person and provided CCO Toth with paperwork confirming his COVID testing appointment. CCO Toth told Ortiz his next report date would be August 19.

2.      CCO Toth Accelerates Report Date and Ortiz Fails to Appear

On August 4, an anonymous person called the front desk of CCO Toth's office and reported that Ortiz "had shot someone and that the victim is not cooperating and people were in danger." CP at 57. The caller did not leave a name or a callback number. The caller was given CCO Toth's cellphone number, but Toth missed the subsequent call and could not return it because there was no voicemail or caller ID. Because of the anonymous tip and Ortiz's history of violent crimes, CCO Toth and her supervisor "decided it was best for community safety to call [Ortiz] in [for] a random drug test. If he was positive for anything, then [they] could at least book him into jail for a couple days for community safety concerns." 1 Verbatim Rep. of Proc. (VRP) (Sept. 29, 2022) at 36.

The same day, CCO Toth accelerated Ortiz's next report date from August 19 to August 5 by 3:00 PM—the following day. To notify Ortiz, CCO Toth called Ortiz and left him a voicemail message. CCO Toth also texted Ortiz. CCO Toth did not get a response from Ortiz to either the voicemail message or text message.

3

The next day, on August 5, CCO Toth called Ortiz again and left him another voicemail message, instructing Ortiz to report in by 3 PM that day. CCO Toth also called Ortiz's roommate, but the number was not in service.

Ortiz did not report in on August 5. According to Ortiz, he did not receive any calls or texts from CCO Toth on August 4 or 5, and he was never notified by anyone at DOC that his report date had been accelerated from August 19 to August 5.

3.      DOC Arrest Warrant, Arrest, and Charges

On August 6, CCO Toth requested a DOC arrest warrant for Ortiz based on his failure to report in the previous day and his failure to be available for contact. CCO Toth's supervisor reviewed and approved the issuance of the DOC arrest warrant, and the warrant issued the same day.

On August 9, Ortiz learned about the DOC arrest warrant when he was arrested for an unrelated incident. However, because Pierce County Jail would not accept Ortiz for detention, law enforcement released Ortiz. Law enforcement informed Ortiz about the DOC arrest warrant.

On August 10, Ortiz called CCO Toth and inquired about the DOC arrest warrant. According to Ortiz, CCO Toth told him she had accelerated his report date to accommodate her training schedule and DOC staffing shortages. CCO Toth later testified that she told Ortiz "that if he turned himself in within five business days, that it would be a low-level violation," but that if he turned himself in beyond that, there "would be a hearing." 1 VRP (Sept. 29, 2022) at 44.

On August 12, Ortiz called CCO Toth to inform her that his infant daughter had passed away unexpectedly. Ortiz claimed that CCO Toth told him he could either turn himself in by the end of the week or contact her weekly while funeral arrangements were pending. CCO Toth, on

4

the other hand, claimed she told Ortiz "that if he remained in contact with [Toth] and he did not get in trouble, that would determine if [Toth] gave him credit for time served or 30 days in his DOC hearing; that at this point, if he wanted to take care of his family, that he could do that." 1 VRP (Sept. 29, 2022) at 47. Ortiz claimed that he subsequently called CCO Toth every week, sometimes more than once a week, from August 12 until he was arrested in September. CCO Toth, on the other hand, claimed that Ortiz called "once or twice," and that she missed one of the calls and discussed funeral arrangements the other time. 1 VRP (Sept. 29, 2022) at 49.

On September 29, Officer Thomas Grabski saw Ortiz standing in the garage of a residence. Officer Grabski intended to arrest Ortiz on his outstanding DOC arrest warrant. Officer Grabski and other officers followed Ortiz when he left the residence in a vehicle, eventually pulling him over. After Ortiz exited the vehicle, he was arrested on the DOC arrest warrant. Officer Grabski searched Ortiz and found a firearm in the waistband of Ortiz's sweatpants.

Ortiz was charged by second amended information with one count of attempted second degree murder, one count of first degree assault, and one count of first degree unlawful possession of a firearm. The State also alleged a firearm sentencing enhancement for both the second degree assault and attempted second degree murder charges.

B.    MOTION TO SUPPRESS

Prior to trial, Ortiz filed a CrR 3.6 motion to suppress the firearm discovered during his arrest on September 29. Ortiz argued that there was an insufficient nexus between his actions and the alleged community custody violation, and that the anonymous tips CCO Toth received were an insufficient basis upon which to issue a DOC arrest warrant. Essentially, Ortiz contended that DOC staff used the DOC arrest warrant as an end run around the usual warrant requirement. The

5

State responded that the firearm should be admitted "because [Ortiz] was arrested on a validly issued and active DOC warrant, and the handgun found in his waistband was the result of a lawful search incident to that arrest." CP at 282.

At the CrR 3.6 motion to suppress hearing, witnesses testified consistent with the facts presented in the preceding section. As stated above, CCO Toth testified that she made several attempts to notify Ortiz on August 4 and 5 of his accelerated report date, while Ortiz testified that he never received any notification from CCO Toth or anyone else at DOC about his accelerated report date.

After the hearing, the trial court stated:

I think the question really just comes down to a couple of things. . . .

> First of all . . . was there a valid warrant? Was the requirement to show up within 24 hours reasonable? Was there sufficient notice if the 24 hours is reasonable? And whose burden is it to show the notice was actually given?

1 VRP (Sept. 30, 2022) at 23. The trial court denied Ortiz's CrR 3.6 motion to suppress the firearm.

In its oral ruling on the motion, the trial court determined that the DOC officer's testimony was credible. In its written findings of fact and conclusions of law, the trial court concluded, in relevant part:

4. The Court concludes that the state established a sufficient and uncontradicted record indicating that CCO Toth did provide notice to Mr. Ortiz regarding his report time.

CP at 204.

C. TRIAL

Ortiz waived his right to a jury trial and the case proceeded to a bench trial. Several witnesses testified for the State. Ortiz did not testify in his own defense. Relevant portions of trial testimony are included below.

1. Milton White's Testimony

White, the shooting victim, was the first to testify. White stated that Ortiz shot him on July 6, and then identified Ortiz in court.

White testified that he and Houlihan were hanging out on July 5, 2020, when they decided to visit the mother of Houlihan's child, Leanita Brown. White and Houlihan arrived at Brown's home around 2:00 PM and spent several hours there. At some point, Ortiz called Houlihan and was invited to Brown's home to join the gathering.

Ortiz arrived as it was getting dark in a black Dodge Charger. Ortiz joined the party and drank with White and Houlihan. White and Brown subsequently began arguing, and their volume escalated to the point that Houlihan and White were asked to leave Brown's home. During this argument, White overheard Ortiz tell Brown's sister, "I don't fight, I shoot." 4 VRP (June 5, 2023) at 111.

White, Houlihan, and Ortiz left Brown's home around 10:00 PM. As the group approached White's vehicle, White and Houlihan were walking together in front of Ortiz. When they reached White's vehicle, Houlihan fell and White attempted to catch him. As he did so, Ortiz shot White twice in the back. White fell down on his back, and Houlihan placed himself between Ortiz and White. Ortiz then shot at White again, hitting him in the mouth. After shooting White in the mouth, Ortiz turned around and left the scene.

7

2.      Mark Houlihan's Testimony

Houlihan's testimony regarding his and White's activities during the day on July 5 largely corroborated White's testimony. Like White, Houlihan testified that Ortiz shot White and then identified Ortiz in court.

Houlihan also testified that he invited Ortiz to join the gathering. Houlihan could not recall what car Ortiz arrived in, but testified that, at the time, he usually saw Ortiz driving a Charger.

Everyone at the gathering was kicked out of Brown's home when an argument got too loud. After exiting Brown's home, Houlihan and White made their way to White's car, with Ortiz walking behind them. When they reached White's car, Houlihan lost his balance and fell. As Houlihan picked himself up, Ortiz shot White in the back. Houlihan placed himself between White and Ortiz. Ortiz shot at White again. Ortiz then left the scene "[i]n his car." 10 VRP (June 14, 2023) at 815. When asked how he knew Ortiz was the shooter, Houlihan stated: "Because he walked right up behind [White] and pointed [a gun] at him." 10 VRP (June 14, 2023) at 812. Houlihan admitted he was drunk at the time of the shooting.

3.      Additional Relevant Testimony

Officer Michael Csapo testified that he came into contact with Ortiz after the shooting but before Ortiz's arrest. When Officer Csapo contacted Ortiz, Ortiz was driving a black Dodge Charger.

Autumn Doidge, Brown's neighbor, testified that she was woken up around midnight on July 6 by loud screaming and heard at least two gunshots. While Doidge did not see the shooter, she testified that she saw "[m]ultiple people le[ave] the scene" in a dark colored Charger. 5 VRP (June 6, 2023) at 331.

Officer Ian Beddo testified that when he responded to the scene on July 6, no one on scene knew who the shooter was.

Detective Foster testified that he also responded to the scene that night. Detective Foster explained that when he contacted White in the hospital that night, White said he did not know who shot him, but described the shooter as "light-skinned," "6'5," with a "thick semi-beard." 8 VRP (June 12, 2023) at 690. Based on that description, Detective Foster prepared a photo montage and presented it to Ortiz. White identified Ortiz as the shooter, and at trial, Detective Foster identified Ortiz in court.

The trial court found Ortiz guilty as charged.

Ortiz appeals.

ANALYSIS

A.    MOTION TO SUPPRESS

Ortiz argues that his convictions should be reversed "because they were supported by evidence discovered in violation of his constitutional right to be free of unreasonable searches and seizures." Br. of Appellant at 12. Specifically, Ortiz contends that the "DOC arrest warrant was invalid because it was pretext for an unrelated criminal investigation." Br. of Appellant at 17. Therefore, Ortiz asserts, the firearm found on his person during the search incident to his arrest on the DOC arrest warrant should have been suppressed.

Even assuming without deciding that the trial court erred in not suppressing the firearm, any error was harmless. Ortiz argues that the trial court's failure to suppress the firearm and ammunition found on Ortiz was not harmless because they were "the primary evidence that Mr.

Ortiz unlawfully possessed a firearm" and because "[t]hey were . . . the only physical evidence connecting Mr. Ortiz to the shooting." Br. of Appellant at 24. We disagree.

Suppression errors are subject to constitutional harmless error analysis. *State v. Thompson*, 151 Wn.2d 793, 808, 92 P.3d 228 (2004). "'To make this determination, we utilize the overwhelming untainted evidence test. Under this test, we consider the untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt.'" *State v. Elwell*, 199 Wn.2d 256, 270, 505 P.3d 101 (2022) (internal quotation marks omitted) (quoting *Thompson*, 151 Wn.2d at 808). The State bears the burden of proving harmless error beyond a reasonable doubt. *Id.*; *Thompson*, 151 Wn.2d at 808.

Here, even if we assume without deciding that the trial court erred in denying the CrR 3.6 motion to suppress, the error was harmless because White's and Houlihan's testimonies established that Ortiz shot White on July 6 and was in possession of a firearm on that date. At trial, White testified that Ortiz shot him on July 6 and identified Ortiz in court. White also testified that he was familiar with Ortiz, having known Ortiz for approximately three years before the shooting. In fact, White testified that he saw Ortiz holding a gun after Ortiz shot him. In addition, White testified that on the night of the shooting, Ortiz arrived at the gathering in a black Dodge Charger.

Houlihan's testimony corroborated White's testimony regarding the shooter. At trial, Houlihan testified that he saw Ortiz shoot White on July 6, and Houlihan also identified Ortiz in court. Houlihan further testified that he had known Ortiz for a couple of years before the shooting. In fact, when asked how he knew Ortiz was the shooter, Houlihan stated: "Because [Ortiz] walked up right behind [White] and pointed [a gun] at him." 10 VRP (June 14, 2023) at 812. Houlihan

testified that while he could not remember what car Ortiz drove the night of the shooting, Ortiz was known to be driving Chargers at the time of the shooting.

Other untainted evidence also shows Ortiz was the shooter. For example, Doidge testified that after she heard gunshots on July 6, she saw at least one person leave the scene in a Charger. And Officer Csapo testified that he pulled Ortiz over in August 2020 and that Ortiz was driving a black Dodge Charger. *See State v. Lazcano*, 188 Wn. App. 338, 363, 354 P.3d 233 (2015) ("The reviewing court considers circumstantial evidence equally reliable as direct evidence."), *review denied*, 185 Wn.2d 1008 (2016).

Ortiz argues that White's and Houlihan's testimonies are not sufficient to uphold his convictions because "both had substantial credibility issues," especially "without the corroborating effect of physical evidence." Br. of Appellant at 25. It is true there was evidence that both White and Houlihan were drunk during the shooting. It is also true that White initially told police he did not know who shot him.[3] However, the trial court found both White's and Houlihan's "testimony to be credible," and we do not disturb credibility determinations on appeal. CP at 232; *State v. Roberts*, 32 Wn. App. 2d 571, 584, 553 P.3d 1122 (2024), *review granted in part*, 4 Wn.3d 1009 (2025); *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011).

Thus, even if the trial court had suppressed the firearm recovered from Ortiz after his arrest on the DOC arrest warrant, the remaining untainted evidence was "'so overwhelming that it

---

[3] Ortiz argues that White initially told police it was a drive by shooting. However, when asked at trial whether he told police who shot White, Houlihan testified that he could not remember. Houlihan was then presented with a prior statement he made to law enforcement and asked whether he told law enforcement it was a drive-by shooting. Houlihan testified that he did not remember telling law enforcement as much.

necessarily leads to a finding of guilt.'" *Elwell*, 199 Wn.2d at 270 (internal quotation marks omitted) (quoting *Thompson*, 151 Wn.2d at 808). The trial court found White's and Houlihan's testimonies to be credible. White and Houlihan identified Ortiz as the shooter; their testimony provides overwhelming, untainted evidence that Ortiz attempted to murder White on July 6. Furthermore, White and Houlihan both testified that they saw Ortiz in possession of a firearm on July 6, which provides overwhelming, untainted evidence that Ortiz was guilty of unlawful possession of a firearm. Because "any reasonable trier of fact would have reached the same result despite the error," we hold that even if the trial court erred in denying the motion to suppress, the error was harmless. *Thompson*, 151 Wn.2d at 808.

## B.     PRESUMPTION OF CREDIBILITY

Ortiz argues that even if the trial court did not err by denying his motion to suppress, this "court should [still] remand for additional factual findings because the trial court abused its discretion at [the] suppression hearing by applying a non-existent presumption of credibility to law enforcement officers." Br. of Appellant at 25-26. We disagree.

Here, the trial court ruled that it had been presented with "testimony from [CCO Toth] . . . that she did, in fact, notify [Ortiz]" of his accelerated report date "in various ways." 1 VRP (Sept. 30, 2022) at 50. The court continued:

> Absent any specific records for documentation, the Court is presented with the question of whether or not the testimony alone is sufficient to satisfy the requirements of notice. While there were credibility issues with at least two of the State's witnesses, neither of those witnesses was the issuing part of the warrant. The DOC officer that did testify appeared to testify credibly and indicated that she had notified the defendant regarding the warrant and specifically about the means of reporting. The Court was presented no evidence contradicting that there was specific notice given, and there was no specific testimony presented showing the

DOC officer lacked veracity. The Court was specifically left with whether or not to find that the testimony was sufficient to satisfy notice.

1 VRP (Sept. 30, 2022) at 50. The trial court then explained:

Absent some evidence of untruthfulness, the Court cannot find that notice was not provided. A DOC officer placed under oath and testifying is to be given the same credibility as a law enforcement officer, absent some question of veracity that is present.

While the Court is dubious as to whether or not the effort that was made to give notice was, in fact, made in a good faith effort, given [CCO Toth's] specific admittance, they were looking to violate the defendant the deference that is required to be given a law enforcement officer that testifies under oath requires that I find that notice was, in fact, given.

1 VRP (Sept. 30, 2022) at 51.

When the trial court's ruling is read in context, the trial court did not apply a presumption of credibility in favor of law enforcement. Rather, the trial court stated that in the absence of evidence suggesting a lack of credibility, a law enforcement officer testifying under oath is afforded the same credibility as any other sworn witness testifying before a court. While the trial court's language was inartful, the court did not make a credibility determination by applying an erroneous presumption. Finding no legal error, we reject Ortiz's argument.

C.     SAG

In his SAG, Ortiz makes several claims that the trial court erred by failing to suppress the firearm found on Ortiz. Ortiz's SAG claims fail.

RAP 10.10(a) allows criminal defendants to "file a pro se statement of additional grounds for review to identify and discuss those matters related to the decision under review." While defendants are not required to reference the record or cite legal authorities, we "will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c).

Ortiz claims that the trial court erred in denying his motion to suppress "because the uncorroborated information related by an anonymous source to the [DOC] did not provide the CCOS' with a reasonable articulable suspicion to justify their decision to conduct an investigatory stop of Mr. Ortiz." SAG at 2. Ortiz also claims that the "trial court erred by failing to apply the [n]exus requirement with regard to the anonymous tip CCO Toth received stating that Mr. Ortiz was involved in a shooting, and her decision to search him with a random drug test, based on the anonymous tip." SAG at 2. However, both of these arguments address pretext, which is fully argued in Ortiz's appellate briefs and are therefore not proper issues for a SAG. *See* RAP 10.10(a) ("[T]he defendant may file a pro se statement of additional grounds for review to identify and discuss those matters . . . *that* the defendant believes *have not been adequately addressed by the brief filed by the defendant's counsel*." (Second emphasis added.)).

Ortiz also claims that that DOC's "decision to stop and search Mr. Ortiz was not justified by exigent circumstances." SAG at 2. However, DOC did not justify its search of Ortiz pursuant to the exigent circumstances exception to the warrant requirement; rather, the search was incident to his arrest. Thus, Ortiz's claim fails.

CONCLUSION

Even if we assume without deciding that the DOC arrest warrant was pretextual, any error in issuing the DOC arrest warrant was harmless. Furthermore, contrary to Ortiz's argument, the trial court did not make a credibility determination based on an erroneous presumption. Finally, Ortiz's SAG claims fail. Thus, we affirm Ortiz's convictions.

14

No. 58526-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Glasgow, J.

_____
Cruser, C.J.